## BLAFFER et al. v. STATE.
### No. 7309.

Court of Civil Appeals of Texas.  Austin.
July 2, 1930.

Rehearing Overruled Sept. 10, 1930.

T. J. Lawhon and C. L. Carter, both of Houston, C. A. Wilcox, of Austin, Claude McCaleb, of Houston, R. L. Batts, of Austin, Jno. C. Townes, Jr., and Otis Meredith, both of Houston, Ellis Douthit, of Abilene, J. W. Lockett, J. Y. Powell, and W. K. Hall, all of Houston, and Ireland Graves and Chas. L. Black, both of Austin, for appellants Blaffer and others.

E. R. Pedigo, of Austin, for appellant S. G. Helm.

W. E. Hawkins and Lyndsay D. Hawkins, both of Breckenridge, and J. T. Sluder, of San Antonio, for appellant Mrs. Goldman.

W. W. Searcy, of Brenham, Walton D. Taylor, of Waco, C. R. Johnson, of Bellville, and Dodson & Ezell, Hill Grover, and Boyle, Wheeler & Gresham, all of San Antonio, for appellant G. C. Perkins.

Claude Pollard, Atty. Gen., and C. W. Trueheart, of San Antonio, for the State.

W. F. Tarver, of Houston, for appellees E. L. Bender, F. V. Bender, D. Frosch, J. W. Yearly, and M. DeGeorge.

**McCLENDON, C. J.**

Suit by the state to recover a tract of land in the Humble oil field, in Harris county, upon the theory of a vacancy between senior surveys on the north and junior surveys on the south, the latter calling for the south lines and corners of the former. Appellants Blaffer et al., who will be referred to as defendants, and others not parties to the appeal held title to the land upon the adverse theory to the state's claim of vacancy. Appellants Tomey, Goldman, Perkins, and Helm, who will be referred to as cross-acting defendants, claimed portions of the land, Tomey under patent and Goldman under application to purchase from the state, and the two latter under mineral right filings. The state contested the validity of their claims and sought to annul them.

The land sued for lies north of the larger Ruhl, Charles, Williams, smaller Ruhl, and Dunman 160-acre surveys, the north lines of which call for the senior surveys Vickers (sometimes called Vickins), Marshall, Stevenson (originally Simonds), R. Dunman, and Strange. The trial court denied the state's contention with reference to the south line of the Vickers, Marshall, and Stevenson surveys,

locating that line as coincident with the north line of the Charles and larger Ruhl; and sustained the state's contention with reference to the land lying west of the Charles and south of the Stevenson, R. Dunman, and Strange, as located by the court. The decree was without prejudice to the rights of Perkins to obtain mineral permits. Otherwise the claims of cross-acting defendants were disallowed; and the patent of Tomey annulled. Both defendants and cross-acting defendants have appealed; but there is no appeal from that portion of the judgment denying recovery of the lands within the lines, as fixed by the court, of the Stevenson, Marshall and Vickers surveys.

For convenience of reference we here insert: "Map showing the surveys in controversy as located according to the respective contentions of Plaintiff and Defendants and showing the vacancy as located by the Court. The heavy, solid lines depict Defendants' locations; the broken lines running north and south show Plaintiff's east and west lines of the senior surveys; the hachured lines show the vacancy as claimed by the State, and the shaded area delineates the vacancy as located by the Court."

KEY.
⬚ Hachured tract described in Pltff. Petition.
▦ Shaded tract described in Judgment.
"C" Represents Call (Field Notes).
"D" Represents Distance (Measured).
⬚ STATE'S A. MAYS

Primarily the case is one of boundary, the appeal involving the true location of the south corners and south, east, and west lines of the Strange and R. Dunman surveys. In final analysis the whole case rests upon the true location of the southeast corner of the R. Dunman. This corner is described in the original field notes as "a stake in a pond from which a pine mk. A. bears South 30 E. 12 varas and a gum mk. D bears south 12 W. 9 varas." This corner has always been recognized as being in a pond south of the Atascocita road, from which, concededly, the junior surveys beginning with the Charles were laid out. The contention of the state and finding of the trial court was that the true southeast corner of the Dunman is in a pond north of the Atascocita road 440 varas north and 230 varas west of the recognized pond corner south of the road, at a point where deputy surveyor Allen claimed to have found the original bearing trees in 1904; and that the calls in the junior for the lines and corners of the senior surveys were mistakes.

The trial court filed elaborate findings of fact upon which its judgment is rested. These findings are attacked by defendants both as a matter of law and factually in every respect in which they are in conflict with defendants' theory of the proper location of the lines and corners involved.

■ We have reached the conclusion that the evidence both as a matter of law and factually establishes the southeast corner of the R. Dunman in the pond south of the Atascocita road; and that there is therefore no vacancy between the senior and junior surveys.

Due no doubt to the great value of the property involved an extraordinary amount of investigation has been made extending to every particle of evidence which might conceivably have bearing even in the remotest degree upon the controversy. The result has been an extended trial in the court below, a record of unusual length (some 4,000 pages) and briefs in proportionate volume (approximately 1,500 pages). We shall not attempt to follow the various contentions and arguments of counsel. This would serve no useful purpose; would lead far afield from the real issues involved; and would extend beyond proper bounds what must needs be an opinion of unusual length. We shall confine ourselves to what we regard the controlling fact issues in the case, and an examination and discussion of the several specific findings of the trial court upon which its holding upon the boundary issue is rested.

The Jones, J. Dunman labor, Strange, R. Dunman, and Simonds (later surveyed as the Stevenson) were located in March, 1838, by deputy district surveyor J. W. Henderson. According to their calls they were surveyed in the order named, each survey calling for the northeast corner of that immediately to the west as its initial corner. No date is given for the Strange and Simonds surveys; the other three are dated: R. Dunman, March 10, 1838; Jones, March 15, 1838; J. Dunman labor, March 16, 1838. The Marshall and the Vickers were also surveyed in March, 1838, but by Green Q. Taylor, district surveyor. Marshall calls for Simonds and Vickers for Marshall. These are concededly junior to the Simonds. Including the Dunman labor in the Strange, each of the six surveys from the Jones to the Vickers calls for a third of a league and has a called width of 1,444 varas. By taking the called differences in lengths of the common lines of the Jones, Strange, Dunman, and Stevenson, the south line of the Strange would be 510 varas south of the south line of the Jones, and 225 varas south of the south line of the Dunman, which in turn would be 520 varas south of the south line of the Stevenson.

By adopting the south pond corner (defendants' theory) the west line of the Strange below the Jones (which we will call the Jones-Strange jog) is increased from 303 varas (defendants' estimate) to 423 varas (the court's finding) in excess of its 510-vara call. On the other hand, by adopting the north pond corner and the lines and corners fixed by the court to conform therewith, the east line of the Strange below the Dunman (Strange-Dunman jog) is increased from 225 to 272 varas or 47 varas in excess of its call; and the Dunman east line below the Stevenson (Dunman-Stevenson jog) is reduced from 520 to 70 varas or 450 varas under its call. It is around these discrepancies that the controversy largely revolves.

The first twenty items of the court's findings of fact cover the boundary issue and are:

"1. The court finds that in the year 1838, J. W. Henderson Deputy District Surveyor of Harris County, Texas, surveyed the John Brown Jones, the Joseph Dunman Labor, the James Strange, and the Robert Dunman surveys consecutively in the order named. The court further finds that the surveyor called for each of the surveys to begin at the northeast corner of the preceding survey after he had surveyed the John Brown Jones, which the court finds was the first survey of this series made by J. W. Henderson.

"2. The court finds that none of the artificial objects including marked trees called for as corners of these several surveys is now in existence.

"3. The court further finds that the San Jacinto river which lies to the north of each of these surveys has pursued the general tendency of moving south at the north end of these surveys and is today farther south, at the northwest and northeast corners of each of these surveys than it was when these surveys were laid out in 1838.

"4. The court finds from the circumstances in this case that the John Brown Jones and the Joseph Dunman Labor surveys were actually run by the surveyor Henderson on the ground, and that the west line of the John Brown Jones survey as run by J. W. Gillespie in connection with his father in 1892 is the original west line of said survey as run by J. W. Henderson in the year 1838.

"5. The court further finds that the said west line of the John Brown Jones survey is well recognized today upon the ground and has been recognized as the west line of the said Jones survey for many years, and that said line runs through the town of Humble, being along one of the main streets of the town, with old homes and old business establishments on either side. The Court finds that the said west and south lines of the John Brown Jones survey have been recognized for the longest period of time, and are also the most generally recognized lines of any lines of the surveys mentioned, and the said west and south lines of the Jones, as well as the patented north and west lines of the Garrett Joy survey are now recognized by occupancy on the ground by some of the defendants herein.

"6. The Court further finds that the river has encroached south at the northwest corner of the John Brown Jones survey approximately 28 varas, and that the southwest corner of the John Brown Jones survey is today 5867 varas south of the present river bank and is co-incident with the northwest corner of the Garrett Joy survey, and that the southeast corner of the John Brown Jones survey is 1444 varas east of the said southwest corner thereof, being near where a black jack grove once stood and where a black jack tree once stood marked 'X.' That the true east line of the John Brown Jones survey runs directly north from the said southeast corner thereof to where the south river bank was in 1838, and which is now approximately 88 varas in the river, the river having moved south 88 varas at this point since the year 1838.

"7. The court finds that the southwest corner of the James Strange survey is 510 varas south of the southeast corner of the John Brown Jones survey; that said corner is located in the prairie. That the southeast corner of the James Strange survey is 1404 varas east of this point and is in the prairie; that the east line of the Strange runs north from this point and extends across the river as the river is located today, about 400 varas, the river having moved south at this point between four and five hundred varas since the year 1838.

"8. The court finds that by beginning at the southwest corner of the James Strange survey, as hereinbefore located, and extending its west line along the east lines of the H. & W. T. Ry. Co. Survey No. 6, the Garrett Joy survey and the John Brown Jones survey for the distance call of 3168 varas, thence east 350 varas, thence north 2727 varas, one would be within 3 varas of the south low bank of the San Jacinto River as it is at present and on a sand bar where the river bank once was, which is the location of the northeast corner of the Joseph Dunman Labor and the most northern northwest corner of the James Strange survey as same was run in 1838.

"9. The court finds that the southwest corner of the James Strange survey as claimed to be located by the defendants is situated in the woods and that said point was in the woods in the year 1838, when Henderson surveyed the Strange, which corner as claimed is approximately 947 varas south of the northeast corner of the Garrett Joy and the southeast corner of the John Brown Jones survey. The court further finds that the southeast corner of the James Strange as claimed to be located by the defendants is now and was in 1838 in the vicinity of standing live timber.

"10. The court finds that the original location of the southeast corner of the Robert Dunman survey was a stake in the edge of a pond north of the Atascocita Road, from which a pine bore south 30 degrees, east 12 varas, marked 'A,' and a gum tree bore south 12 degrees, west 9 varas, marked 'D,' and which corner is 440 varas north and 230 varas west of the northeast corner of the W. W. Williams survey as the same is located today. The court finds that the said pine and gum trees were cut down and cut into at this point by R. D. Allen, Bob Bush, Geo. Slaughter, George and Will Dunman about the year 1904 and that they were the original bearing trees for the southeast corner of the Robert Dunman survey; the Court further finds that this corner also was the northeast corner of the original A. Mays survey, as same was surveyed by Bringhurst about the year 1851, and that the southeast corner of the original A. Mays survey is 1000 varas south of this point and is within 3 varas of a large dead black or red oak stump, which stands at the bearing called for in the field notes of the A. Mays survey, and out of which a block has been taken. The court finds that this tree was a living tree when the A. Mays survey was laid out and was the original bearing tree for its southeast corner.

"11. The court finds that a point 610 varas west from this point is in a field, which was once the eastern edge of a prairie.

"12. The court finds further that at a point west 1000 varas from the stake at the said southeast corner of the Robt. Dunman survey at the north pond a pine tree stood approximately the bearing called for as the northwest corner of the A. Mays survey, and that Nat. Williams cut this tree in the year 1904 and found in the tree a surveyor's mark 'D.'

"13. The court finds that 444 varas farther west from this point is the southwest corner of the Robert Dunman Survey and that the same is located in the prairie. The court finds that the southwest corner of the Robert Dunman as claimed to be located by the defendants is now and was in the year 1838 in a wooded country and not in the prairie.

"14. The court finds that the river at the northwest corner of the Robert Dunman survey and at the northeast corner of the Robert Dunman survey is between four and five hundred varas farther south than it was in the year 1838, and that none of the bearing trees at either of these corners is now standing.

"15. The court further finds that neither the Taylor nor Bringhurst field notes of the original A. Mays survey were ever returned to and filed in the General Land Office of the State of Texas.

"16. The court finds that when D. Gregg, in the year 1860, surveyed the W. T. Charles survey, calling to start 500 varas north of the southeast corner of the R. Dunman, he was mistaken and made the statement that he began 500 varas north of the southeast corner of the R. Dunman survey without having actually ascertained its true location by running the lines of the R. Dunman survey, and that the said Gregg was also mistaken when he called for the lines and corners of the A. Mays survey while surveying the Jacob Ryan survey during the same year, and the same is true with respect to his calls for the south line and the southwest corner of the R. Dunman survey, the east line and the southeast corner of the James Strange survey, while surveying the smaller E. Ruhl survey; that all of said calls were matters of conjecture on his part and made without his having actually run or identified the true lines of said surveys, namely, the R. Dunman, the A. Mays, and the James Strange.

"17. The law presumes that these surveys, the James Strange and the R. Dunman, were run on the ground and there is no direct evidence here that they were not; still there are facts and circumstances in this record from which the Court finds that the lines running north and south, being the east and west lines of said surveys, were not actually run out on the ground but were called for by projection to make the quantity of land to be embraced within the said surveys.

"18. The court finds that the property herein described, towit: 237 acres of land

"Beginning at a stake at the S. E. corner of the Robert Dunman one-third league survey in Harris County, Texas. Said corner is at the edge of a pond locally known as Alligator Pond north of the Atascocita Road, and being 440 varas north and 230 varas west from the N. E. corner of the W. W. Williams one labor survey;

"Thence north with the east line of said Robert Dunman survey, as located by this judgment, 70 varas to a stake for corner, same being the herein ascertained S. W. corner of the J. B. Stevenson Survey;

"Thence east with the south line of said Stevenson survey, 230 varas to the N. W. corner of the W. T. Charles Survey;

"Thence south with the west line of said Charles survey 510 varas to the N. E. corner of said W. T. Williams one-labor survey, same being at an iron pipe in a pond south of the Atascocita Road;

"Thence west with the north line of said Williams survey and the smaller E. Ruhl survey, 1444 varas to the most northern N. W. corner of the smaller E. Ruhl survey;

"Thence South 225 varas to the re-entrant corner of the said Ruhl survey;

"Thence west 400 varas to the most southern N. W. corner of the said Ruhl survey;

"Thence south 30 varas to stake for corner in the West line of said Ruhl survey;

"Thence West passing the N. E. corner of the Joseph Dunman 160 acre survey at 85 varas, and continuing west 1106 varas in all to the re-entrant N. E. corner of the H. & W. T. Ry. Co., Survey No. 6;

"Thence north 423 varas to the south line of the James Strange survey as located by this judgment, at a point 510 varas south and 128 varas east from the S. E. corner of the John Brown Jones Survey, as said S. E. corner is found by the court in this suit;

"Thence east with the south line of the said James Strange survey 1276 varas to the S. E. corner of same;

"Thence North with the east line of the said Strange Survey 272 varas to a stake, the S. W. corner of the said Robert Dunman ⅓ league survey;

"Thence east 1444 varas with the south line of said Robert Dunman survey to the place of beginning, containing two hundred and thirty-seven (237) acres of land, the said area being that enclosed within the red lines as shown on the attached plat which is hereby made a part of this judgment, is no part of the land originally included within the boundaries of the Robert Dunman, the James Strange, or the J. B. Stevenson surveys, but is embraced within the area sued for herein by the State of Texas, and belongs to the State of Texas.

"19. As affecting the location of the San Jacinto River in the year 1838 the court finds that the John Brown Jones, the Joseph Dunman Labor, James Strange, and Robert Dunman surveys together with the two surveys lying north and across the river, namely, the Mary Owens and the Elijah Votaw, were all originally surveyed in the year 1838, and all of said surveys were made by Deputy District

Surveyor J. W. Henderson, except the Mary Owens, and that by placing' the south lines of the surveys lying south of the San Jacinto River where the State contends they should be, and calculating the area of all of said surveys together, the court finds that they contain the quantity of land called for in the original patents, together with sufficient excess to accommodate the bed of the river flowing across said surveys, irrespective of the location of the bed of said river.

"20. The court further finds that the south lines 'of the Stevenson, Marshall and Vickers Surveys are coincident with the north lines of the W. T. Charles and larger E. Ruhl surveys, except for 230 varas of the south line of the Stevenson, which lies directly west of the northwest corner of the Charles." ·

The theory of the state is that the Jones and Dunman labor were first surveyed, and the Strange, Dunman, and Simonds were constructed, from a meander of the river without an actual survey of their interior lines. This theory concedes an actual meander of the river for the purpose of getting the northing or southing of the northeast corner of each survey relative to its northwest corner. It also concedes an actual survey of all the south lines, the jogs between the south lines of contiguous surveys and the east line of the Simonds. The court adopts this theory, stating that there are circumstances in the record to sustain it, but does not state what those circumstances are. The circumstances which the state contends support it are that Henderson called for a line tree at each river corner and that all the east and west lines of the one-third league surveys end in O or 5. Just how these circumstances tend to show that the interior lines were not actually run on the ground we are unable to see. However, we will adopt the theory as a working hypothesis in considering the court's findings that the river is from 400 to 500 varas south of where it was in 1838 at the northeast corners of the Dunman and Strange due to avulsive changes in its bed. Assuming that the common lines of the Strange, Dunman, and Simonds were not actually surveyed, it was necessary for Henderson first to meander the river so as to get the relative southing or northing of the northeast corners of the Strange, Dunman, and Simonds. After this he would have to calculate the length of the east and west lines and then make an actual survey of the exterior lines from the southeast corner of the Jones to the northeast corner of the Simonds. It would be immaterial, under this theory, whether he began at the southeast corner of the Jones or the northeast corner of the Simonds. The proof of his work would be the closing line which would be either the east line of the Simonds or the Jones-Strange jog. Any substantial error either in getting the river corner northings or southings, or surveying the lines, would show up in this closing line. According to the original field note calls the northeast corner of the Simonds would be 280 varas north of the northwest corner of the Jones. The northeast corner of the Simonds, as found by the court, is 123 varas south of the northwest corner of the Jones. This makes a shortage of 403 varas under the field note calls. This shortage is accounted for in the decree by shortening the Dunman-Simonds jog 450 varas (a 520-vara call reduced to 70 varas) and by lengthening the Strange-Dunman jog 47 varas (a 225-vara call increased to 272 varas). The state's theory, upon which the suit was brought, accounted for this shortage by an avulsive change in the river at the northeast corner of the Simonds which would throw that corner 450 varas north of where it is fixed by the court, and the same distance north of where defendants contend. The defendants' theory accounts for this shortage by lengthening the Jones-Strange jog. Parenthetically, it should be noted, however, that defendants do not concede the shortage to be greater than 303 varas, based upon their contention that the west line of the Jones must be located from the J. D. Magnolia corner which will be considered later.

We will digress, for the moment, to consider the evidence of changes in the river since 1838. Upon this subject there is a mass of testimony. However, the residuum may be stated briefly. It may be conceded that the testimony shows conclusively that there has been a general southward trend of the river since 1838, and that there have been two very marked avulsive changes which appear in the above map in the northern part, or to the north of the Strange and R. Dunman 'surveys; which avulsive changes, however, have no bearing upon the case. The state offered Mr. Arthur Stiles, an expert upon the subject of changes in river beds, whose testimony is beyond any question, and we take it at its face value in every respect. Mr. Stiles made a very careful, minute, and painstaking examination of the environs at the northern extremities of the lines of each of the seven river surveys (Jones to Vickers). His testimony shows beyond dispute that there has been no appreciable change in the bed of the river since 1838, at the northeast corner of the Stevenson, and the court so found; and this is true whether we place the northeast corner where found by the state or 230 varas west, where claimed by defendants; there being only 5 varas difference in the northings at the river intersection of these two lines. The same is substantially true as to river changes at the north corners of the Jones and Dunman labor. There have been no avulsive changes at these points, and the erosion has in each instance been less than 100 varas. The court made specific findings on these points, and they are supported by testimony. Mr. Stiles testified to avulsive

changes at the northeast and northwest corners of the R. ·Dunman as claimed by the state, and found by the court. The condition at these points was gone into very minutely. At the northwest corner of the Dunman there is a primary escarpment which he testified was once the northern bank of the river, and which is 486 varas north of the present south escarpment of the river, at the intersections of the state's west Dunman line.

Mr. Stiles does not testify that the river in fact flowed at the foot of this north escarpment in 1838. His testimony taken in the strongest light for the state merely shows that the evidence he found on the ground does not exclude the possibility that the river flowed there as late as 1855. This is based upon the fact that he found certain sycamore stumps in the bed of the old stream at this point and by taking the age of the oldest stump it dated back to 1856. He testified that sycamores usually appeared in the abandoned beds of streams within a year or two after the abandonment. He found sycamore stumps of varying ages. Only one stump dated back to 1856, the others being of different dates for quite a number of years after that. This evidence, of course, established that the change in the river bed was necessarily prior to 1855. How long prior to that date there is nothing to show. That other trees in the bed of older age may have entirely disappeared is not at all improbable. In other words, there is no reasonable certainty that any of the first group of trees, assuming they began to grow up in the river bed within a year or two after the change, were still in existence. We will assume, however, that the evidence is sufficient to show that this avulsive change in the river took place after 1838 and prior to 1855. This change, however, will not account for the discrepancy between call of the east line of the Strange as found by the court and the actual measured distance on the ground. If we project that line its call distance from the southeast corner as fixed by the court, its northern extremity will be upon the primary escarpment, which Mr. Stiles testifies was as far north as the river could possibly have been in 1838. In other words, in order to construct the line according to its call from the southeast corner as fixed by the court, it would have to be projected across the river and its northern extremity placed upon the north bank as it existed in 1838. Mr. Stiles shows that the south escarpment of the river, prior to the avulsive change he pictures, was approximately 234 varas south of the northeast corner of the Strange as fixed by the court.

With reference to the northeast corner of the Dunman, Mr. Stiles testifies to an avulsive change in this vicinity which may possibly have occurred since 1838. This change, however, but slightly involved the position of the river along the east line of the Dunman, as fixed by the north pond corner. 230 varas east along the line fixed by the south pond corner, the change, if any, was even more slight. Stiles places the north escarpment (the most northerly possible position of the north bank of the river in 1838) only 180 varas north of the present north bank of the river. 230 varas to the east this distance is reduced to 80 varas. The northeast corner of the Dunman, as fixed by the court, is some 200 varas north of the Stiles' north escarpment. An impossible location under any phase of the testimony. Most of Stiles' evidence of the avulsive change in this vicinity relates to the condition several hundred varas to the west of the court's east line of the Dunman. The new channel manifestly met the old channel at a point very near the court's Dunman east line, and the change had virtually disappeared 230 varas farther east. The state in its brief contends that Mr. Stiles shows an escarpment which extends off towards the north at a point some 250 varas west of the state's east line of the Dunman, and that, if this escarpment were projected, it would extend north of the state's northeast corner of the Dunman as fixed by call distance from the north pond corner. There is no warrant in Mr. Stiles' testimony for such conclusion. His map does show an escarpment extending for a short distance to the northeast at the point indicated, where it terminates so far as the map or testimony is concerned. The escarpment extending in a southeasterly direction from that point clearly from the map showing and from Mr. Stiles' testimony was intended to mark the most northerly location of the north bank of the river since 1838. If any significance were attached to the broken escarpment referred to, it should have been extended so as to show just where it would intersect a projection of the east line of the Dunman. There would be no point whatever in leaving the map in this unfinished condition, if the broken escarpment had any bearing whatever upon the controversy. Mr. Stiles fully understood the issues involved. He knew where the state's east line and the state's northeast corner of the Dunman would fall, and he so placed them on his map. His testimony conclusively shows that the state's northeast corner of the Dunman is some 200 varas north of the most northerly point at which the north bank of the river could have been in 1838. The state's map between pages 2 and 3 of its brief does not even show the broken escarpment; but in every essential detail is in accordance with Stiles' map and testimony. There is no evidence in the record to support the court's finding that the river, at the intersection of the Dunman east line as fixed by the court, is between 400 and 500 varas further south than it was in 1838. A change of about 180 varas marks the limit the evidence will admit.

Based upon the physical facts, and with the evidence construed most strongly in favor of the state, the court's findings of a 400 to 500 vara avulsive change in the river since 1838 at the court's northeast and northwest corners of the Dunman must fall as being without support in the evidence; the greatest possible changes at those points being about 250 varas at the northwest and less than 200 at the northeast corner.

There are several unsurmountable difficulties in the court's location of the northeast corner of the Dunman between 400 and 500 varas north of the present south bank of the river. In the first place it would add 450 varas to the call length of the Simonds east line. This would throw the northwest corner of the Simonds 110 varas north of its northeast corner—an impossible location under any phase of the evidence. According to the original Henderson calls the northwest corner is 340 varas south of the northeast corner. In 1854 the Simonds was resurveyed as the Stevenson, Henderson being one of the chain carriers. In this survey the east, west, and south lines are given the same length as in the original survey. Additionally the river meanders are given, a detail not contained in the original Henderson field notes of any of the river surveys. These meanders, according to the testimony of Gueringer, one of the state's leading surveyor witnesses, conform very nearly to the river's actual course along the north boundary of the Simonds as fixed by the south pond corner, but do not conform to its course along said boundary as fixed by the north pond corner.

Again, the northeast and northwest corners of the Simonds, as fixed by original call distance from its south line as fixed by the court and contended for by defendants, fit the south bank of the river as it exists today within margins which are readily accounted for by erosive changes. Based upon the north pond corner line, the measured distance of the west line is 5,544 varas, a shortage of 56 varas. 230 varas east (south pond west line) the measured distance is 5,540 varas, a shortage of 60 varas. At 1,444 varas east of the north pond west line the measured distance is 5,892 varas, a shortage of 48 varas. 230 varas east (defendants' east line) the measured distance is 5,887 varas a shortage of 53 varas. It would be dealing in pure surmise, without any support in the record, to make a finding that the original survey by Henderson in 1838, and the resurvey with Henderson as chain carrier in 1854, each carried a 450-vara error in the west line, the effect of which would place the northwest corner 110 varas north instead of 340 varas south of the northeast corner, thus giving to the river an impossible course under any phase of the testimony.

Furthermore, the Dunman northeast and Simonds northwest corners are identical and cannot be separated. If this corner is moved north 450 varas to conform to the Dunman east line call, it necessarily adds 450 varas to the Simonds west line and makes that line 450 varas longer than its call.

It is manifest that the found avulsive change at the Dunman northeast corner is entirely eliminated as a factor in explaining the discrepancy of 403 varas between the original calls and the actual measured distance in southings and northings from the Jones northwest to the Stevenson northeast corners, either upon the theory that the internal lines were not actually surveyed, or upon any other theory which the evidence will support. And the same is true of the found avulsive change at the northwest corner of the Dunman.

The north pond corner can only be sustained upon the theory that Henderson in surveying the Dunman-Simonds jog (and the state's theory and court's holding is that he actually surveyed this jog, and not the line north of it to the river) made a mistake of 450 varas in surveying a line only 520 varas long—in other words reduced a 520-vara line to 70 varas. There are other circumstances showing the extreme improbability of such a mistake which we will discuss later.

We return to a consideration of the state's (and court's) theory that the interior lines between the Strange and the Simonds were not actually surveyed, and the last three of the five Henderson surveys were made from a meander of the river for northeast corner northings and southings and an actual survey of the outside lines (Jones southeast corner to Simonds northeast corner). The following facts appear on the face of the original Henderson field notes: (1) That he used round figures ending in 0 or 5 in his east and west lines; (2) that in his calculations of area he did not take into consideration the river meanders in the north boundary of the several surveys, but used the simple trapezoid figure; (3) that he used the round figure 5,770-vara median line, or 11,540 varas as the sum of the east and west lines of the trapezoid; (4) that any error in his calculations would be more likely to appear in the Strange than in any other survey, on account of its more complicated figures; (5) that a manifest error in calculation appears on the face of the Strange, in that the east line of the Dunman labor (2,727 varas, which is 260 varas shorter than its west line, 2,987), plus the west line of the Strange below the Dunman labor (3,168 varas), plus the Strange east line (5,645 varas), equals 11,540 varas, whereas, if the Strange-Dunman labor one-third league trapezoid were properly constructed, the east line of the Strange has an excess of 260 varas; (6) that the east lines of the Jones and Strange are exactly the same length (5,645 varas), so that, if the trapezoid were properly constructed, the Jones-

Strange jog would necessarily be the same length as the southing from the Jones northeast to the Strange northeast corner.

To construct a simple trapezoid with a 1,444-vara base and a 5,770-vara median line, the first prerequisite would be to get the southing or northing, which would furnish the basis for the difference in length between the east and west lines. This done, the formula for the longer line would be $\dfrac{11540 + \text{southing}}{2} = \text{longer line}$. Transposing we would have: Southing=(longer line×2)—11540. According to the Henderson field notes the west line of the Strange-Dunman labor trapezoid is 6,155 varas. Substituting this figure in the last equation we have: Southing=(6,155×2)—11540=770 varas. This 770-vara southing would throw the northeast corner of the Strange approximately where the south bank of the river was in 1838 as detailed by Stiles and as shown by his drawing, under either the state's or defendants' theory of locating the Strange east line. If Henderson used a 770-vara southing, and the above evidence points to this as very probable, then there is a very plausible theory which would account for lengthening the Jones-Strange jog from 510 to 770 varas. With a 770-vara southing the east line of the Strange (11540—6155) should have been 5,385 varas. It calls for 5,645, or 260 varas excess. If in calculating the Strange east line Henderson by mistake took from 11,540 the sum of the east 2727-vara (instead of the west 2,987-vara) line of the Dunman labor plus the Strange west line below the Dunman labor (3,168 varas), we have 11,540—5,895=5,645, the Henderson call for this line. If the Strange were actually surveyed according to calls, this mistake would throw its northeast corner 260 varas north of the south bank of the river; and if the interior lines were not actually surveyed (state's theory and court's finding) this 260-vara error would throw the northeast corner of the Simonds 260 varas north of the south bank of the river, and the error would show up in closing the exterior lines. This, of course, is assuming that Henderson actually surveyed the Jones-Strange jog as 510 varas. But Henderson, in making the actual survey of this jog may not have used the figure 510, which would not appear from his plat, but is only arrived at by adding Dunman labor east to Strange west below Dunman labor and subtracting Jones east (2,987+3,168=6155—5645=510). As a practical surveyor he may not have used this method of calculating the jog when he made the actual survey. His plat showing the east line of the Strange and Dunman to be the same length, and the areas (one-third league) and base lines (1,444 varas) being the same, the southing (770 varas) and the Jog must necessarily be the same; and in surveying the

jog he may have used the southing instead of making the calculation. This method correctly followed would place the northeast corner of the Strange 260 varas south of where placed by the court and the state, and would place the Simonds northeast corner 20 varas north of the state's northwest corner of the Jones (following otherwise the Henderson calls). This point, is 143 varas (instead of 403 varas) north of its actual location by the decree, or just 47 varas north of where it would be located by call and distance from the J. D. Magnolia.

We feel justified in this rather full discussion of the state's theory of the manner in which Henderson constructed the five river surveys, and of claimed avulsive changes in the river since 1838, on account of the prominence given to these issues in the statement of facts, the state's several briefs, and the court's findings. From these findings, it seems apparent that the court gave very great weight to his found avulsive river changes. It also seems highly probable that, but for his findings in this regard, he would not have adopted the north pond corner. As we have above demonstrated, these findings not only are not supported, but are negatived, by the undisputed evidence. The entire elaborate theory which the state has erected upon these findings must fall in like manner as these findings fall; and the north pond corner must stand, if at all, upon legal evidence that it is the true corner, placed there by Henderson in 1838; and not upon any theory of a general plan of laying out the five river surveys, or of supposed avulsive changes in the river since 1838.

We will now discuss the evidence which has material bearing upon the south pond corner location. This we will follow with a discussion of the evidence which the state contends is sufficient to uphold the court's finding of the north pond corner location.

At the outset we make the following general observations which should be borne in mind in following the evidentiary sequence. It is not questioned: That at the south pond corner the natural objects called for by Henderson existed precisely as described by him in the original Dunman field notes—that is a gum with a surveyor's mark D and a pine with a surveyor's mark A at the called course and distance from a stake in a pond; that from this south pond corner the Charles, larger and smaller Ruhl, and Ryan were located in 1860 by Gregg, district surveyor; that later other surveyors located from this corner the J. Dunman 160 acres, the two railroad surveys, and the Hairgrove; that up to the time Allen claims to have discovered the north pond corner (November, 1904), the south pond corner was universally recognized as the true southeast corner of the Dunman (there is not a scintilla of evidence in the record that any one ever denied or

disputed its authenticity or ever heard of the north pond corner location); and that the Mays as originally located prior to February 20, 1840, and as resurveyed by Bringhurst, district surveyor, in 1851, was in fact located from the true southeast corner of the Dunman. The state attempts to support its contention and the court's finding that Gregg was mistaken in the south pond corner as the true southeast Dunman corner (and the court's judgment concededly must stand or fall as this finding stands or falls), upon the theory that the surveyors' marks upon the D gum and A pine at the south pond corner were not made by Henderson, but were made either by Gregg in 1860, or by some other person prior to 1860, and subsequently to Henderson's 1838 survey of the Dunman; and that all of the line and corner markings and uniform recognitions of lines and corners of the Strange, Dunman, and Stevenson surveys, which will be later adverted to, were the result of this original Gregg mistake.

We will now examine this theory.

The original field notes of the Mays were lost and were never filed in the land office. It was, however, originally located by Green Q. Taylor, district surveyor, subsequently to the Dunman (March 10, 1838), and prior to February 20, 1840. This appears from recitals in a title bond of the latter date from Mays to Roeder. Concededly, as stated, it was located from the true Dunman southeast corner. This appears from the earliest (1847) land office map of this region. The Mays-Roeder title bond also recites "that it (the Mays labor) is the same on which the said Mays now lives." The Mays was therefore occupied as a home as early as 1840, and its lines and corners, especially its initial (true Dunman southeast) corner must have been known to Mays and his vendees. On October 10, 1840, the Mays passed by title bond from Roeder to Joseph Dunman, a cousin of Robert Dunman, original grantee, and then owner of the Dunman one-third league, from the true southeast corner of which the Mays was located. In 1851, the Mays was resurveyed by Bringhurst, district surveyor. The field notes of this survey begin at the Dunman southeast corner, and proceed thence 1,000 varas with its south line for the Mays north line. The initial corner calls give precisely the Henderson calls for the Dunman southeast corner. The record shows that this survey was made at the instance of Jos. Dunman, then owner of the title bond, and that he was one of the chain carriers. The state concedes that this survey also was made from the true Dunman southeast corner, but contends that Bringhurst began at the north pond corner. Jos. Dunman owned the Mays until 1852, and it was owned by other members of his family in 1860 when Gregg located the Charles, two Ruhls, and Ryan.

In 1845 Strange conveyed to William K. Wilson by metes and bounds the east one-third of his headright. This Wilson was one of Henderson's chain carriers in surveying the Dunman. The field notes of this deed call for the northwest Dunman and the southeast Strange corners, from which latter the southwest corner of the tract conveyed is thus located: "Thence west with the south boundary line of this survey 480 varas to a stake in the prairie." As we shall note later the recognized west line and southwest corner of this tract is located from the southeast corner of the Strange as fixed by the re-entrant corner of the Ruhl.

As noted above the Simonds was resurveyed as the Stevenson in 1854 with Henderson (original Simonds surveyor) as one of the chain carriers. In addition to the evidence above noted of difficulties in and extreme improbability of locating the Stevenson from the north pond corner, we note here the following additional circumstances. The court's location of the Stevenson southwest corner, under the undisputed evidence, places that corner either in the north pond or at its western edge just 70 varas (194 feet) north of the north pond corner. This pond was prominent as a landmark. Henderson (the court found) had called for it as the Dunman southeast corner, and in proceeding east on the south line of the Simonds and Stevenson surveys it would have been necessary to pass through the center of this pond. If Henderson, in surveying the Dunman-Simonds jog in 1838, made a 450-vara error in running a 520-vara line, shortening that line to 70 varas (extremely improbable as we have shown), he could hardly have escaped detecting the error in 1854 when he assisted in the resurvey. To this should be added the compelling circumstance that no one ever heard of the north-pond corner until Allen claimed its discovery in 1904; and no one ever located the Stevenson southwest corner 70 varas from this north pond corner until the court decreed it there in this suit.

The above was the situation, undisputed by any fact or circumstance in evidence, when Gregg in 1860 located the Charles, two Ruhls, and Ryan surveys.

Gregg's field notes describe the Charles as "south of and adjoining the J. B. Stevenson east of and adjoining the labor of A. Mays, Beginning at a stake for corner on R. Dunman's east boundary line 500 varas north of said Dunman's S. E. cor." with bearing trees, etc. In his field notes of the smaller Ruhl he calls to begin at the northwest corner of the Mays, proceeds "west with R. Dunman's south boundary line 444 varas to Dunman's S. W. corner stake * * * Thence south 225 varas to James Strange's S. E. cor. stk. * * * Thence west 400 vrs. to cor. on J. Strange's south boundary line * * * Thence south 630 vrs. * * * Thence east 884 vrs. to cor. on A. May's

west boundary line. Thence north 855 vrs. with May's W. line to the beginning cor." His Ryan field notes begin "at the S. E. cor. of A. Mays labor" for its northeast corner, and describe its northwest corner as "115 vrs. West of A. Mays S. W. cor." In connection with his location of these four surveys he filed in the land office a plat, which plat shows the position of the four surveys made by him relative to the south lines and corners of the Strange, Dunman, Stevenson, Marshall, and Vickers, the west line and southwest corner of the Harris, and the north line of the De Zavalla (Victor Blanco). Gregg certified June 23, 1860, that the "foregoing plat and field notes are correct and were made according to law and that the same marks and lines are truly described." The plat speaks for itself, and we here insert it:

It is to be noted that in describing the northern northwest and re-entrant corners, respectively, of the smaller Ruhl, Gregg uses the following language: "Thence west with [R. Dunman's south boundary line 444 vrs. *to Dunman's S. W. cor. stake*," and "thence south 225 vrs. *to Strange's S. E. corner stk*." This language on its face appears to be a declaration by Gregg that he actually found Dunman's southwest and Strange's southeast corner stakes. It should be further noted here that to locate the Mays originally and as resurveyed by Bringhurst in 1851 at the north pond corner would make it conflict with the smaller Ruhl as located by Gregg in 1860.

The state's theory of Gregg's mistake admits the existence of the south pond bearing trees at the exact location called for by Henderson, and that they bore the same surveyor's marks as Henderson described as early as 1860. The theory is, however, that these marks were not placed there by Henderson in 1838, but were placed either (1) by Gregg in 1860, or (2) by some other person between 1838 and 1860. The location of this corner affects very materially the Strange, Dunman, Stevenson, and Mays (not to mention the Marshall and Vickers) all separately

owned. To move this corner from the south to the north pond would move the entire Mays 440 varas north and 230 varas west; it would shift the entire west line of the Stevenson and the entire east and west lines of the Dunman and Strange 230 varas to the west; and the entire south lines of the Dunman and Stevenson 440 varas to the north. Any surveyor should know this, and especially Gregg, since he platted all these and other contiguous surveys in connection with his work. That Gregg, a district surveyor of reputation, acting in his official capacity in the state's interest, found two unmarked trees in the south pond and marked them with the marks of Henderson, knowing, as he must have known, the effect of his act upon the rights of the several land owners involved, is unthinkable. It finds no support in the evidence and can only be based upon pure conjecture or surmise. Nor do we think the state's theory that Gregg placed Henderson's marks upon trees he found at the south pond corner is consistent with the court's finding of mistake on Gregg's part. Such theory would necessarily impute to Gregg a willful, if not in fact fraudulent, attempt to manufacture evidence. The record does not support the theory. The court found that Gregg correctly located the south line of the Stevenson. His field notes carry the declarations that he actually found, not only the south pond corner which marked the Dunman southeast and Mays northeast corners, but also the Dunman east and south lines, the other three corners and the four lines of the Mays, the Dunman southwest and Strange southeast corners, and the east and south lines of the Strange. He must have satisfied himself as to the correctness of all these calls.

The theory that some person, other than Gregg, marked the south pond trees after 1838 and prior to 1860 is equally without support in the record. As shown above, all the contiguous surveys would be materially affected by this change in location of the Dunman southeast corner, and it is not within the range of probability that the owners of all these surveys entered into a conspiracy to defraud the state. At one place in the state's brief it is suggested that Joseph Dunman might have marked the trees. Not only is there not a scintilla of evidence upon which to base this suggestion, but it does not gibe even with the state's theory. Jos. Dunman owned the Mays from 1840 to 1852. In 1851 he had it resurveyed by Bringhurst, he being one of the chain carriers. The state concedes that this survey was laid out from the true southeast corner of the Dunman, but contends that this was from the north pond corner. If Jos. Dunman had anything to do with creating the south pond corner, it must therefore have been sometime between 1851 and 1860. Why he should have sought to move the corner from its location by Bringhurst cannot be answered from the record. Additionally, under this

theory, the marks would have been less than nine years old when Gregg did his work in 1860, and he could hardly fail to note that Henderson could not have placed them there 22 years before.

In addition to the foregoing considerations, the theory of mistake by Gregg involves another extreme improbability, namely, that it was never discovered by any one until 44 years after it was originally made by Gregg.

The record shows the following without dispute: the D gum and A pine at the south pond corner, marked and located exactly as Henderson described them, and a uniform recognition of this location as the Dunman southeast corner from the earliest times; the Mays, Charles, Ryan, E. Ruhl, Dunman 160 acres, and the two railroad surveys were located from this corner; north from this corner to the river was an old marked line existing as far back as the recollection of the earliest witness, which was recognized as the common line between the Stevenson and the Dunman; the south line and southwest corner of the Dunman, the southeast corner of the Strange, and the line north from that point to the river were evidenced by old markings; at the north extremity of this line was a magnolia, with a surveyor's mark R. D., which was very old (Henderson calls for a red oak marked R. D.); this R. D. magnolia was at the mouth of Jorddan gulley, approximately 1,444 varas west of the east line of the R. Dunman as fixed by the south pond corner, and was finally washed away in the flood of June, 1924; the line running south from this point was recognized as the common Strange-Dunman division line as far back as evidence could be produced; 1,507 varas west of this recognized Strange-Dunman line was an old marked line which had been uniformly recognized as the east line of the Jones; at the northern extremity of this line, at the mouth of a slough, was a magnolia marked J. D., with very old marks, corresponding in every way with the tree originally called for in the Henderson field notes; this J. D. magnolia was "crippled" by the 1900 storm, broken off by the 1915 storm, and finally washed away in the June, 1924 storm, but the spot is still marked by a stake as the northeast Jones corner.

We will review in brief outline the more important evidence with reference to these lines and corners.

As already stated, J. J. Gillespie was a chain carrier for Gregg when he located the Charles in 1860. He moved to Houston in 1858, was a surveyor of high repute, did extensive surveying in the region in question, and was district surveyor in 1871, when he located the Dunman 160 acres. His son, J. W. Gillespie, was also a surveyor of high reputation, both as to integrity and ability, and he was district surveyor in 1892. He had done a great deal of surveying in this vicinity, and

his work extended over his entire professional life and over a longer period than that of any other witness in the case. In 1879 he assisted his father in locating a tract in the Victor Blanco. His father told him that he was with Gregg when the Charles was surveyed in 1860, and that they would go to the corner where Gregg had started. His father thereupon took him to the south pond corner and pointed out the bearing trees, the A pine, and the D gum, which were then marked with very old marks. His father then placed his own initials "J. G." under the D on the gum. That these trees existed with the original marks and the J. G. on the gum added by J. J. Gillespie is not open to question. Numerous witnesses testified to the fact. The pine had died prior to Allen's work in 1904, but the stump remained. The gum was still there with the original and the Gillespie marks, and it was finally blown down by a storm in 1915. From the south pond corner the Gillespies ran the line north to the river, passing the stake set for the Charles northwest corner, and finding a marked line with very old marks extending all the way to the river. From the latter point they went up the river, where J. J. Gillespie pointed out to his son the J. D. magnolia at the mouth of Jordan gulley as the northwest corner of the Dunman. The Gillespies stopped at Jos. Dunman's home on this occasion. All this happened in 1879, and was testified to by J. W. Gillespie.

In 1887, J. W. Gillespie assisted his father in making the first subdivision of the Dunman. At this time they surveyed the south and east lines of the Dunman and found both lines marked with very old marks. In this work two tracts of 238 and 500 acres, respectively, were surveyed out of the north half of the survey. In connection with this work, J. J. Gillespie filed a plat which showed the southeast corner of the Dunman in the pond south of the Atascocita road, and its southwest corner in the prairie.

In 1892, Gillespie and his father did some surveying in the Strange in connection with the partition of lands located in the northern part of the Jones, Dunman labor, and Strange. At this time they surveyed the south and east lines of the Strange; and it was on this occasion that he first saw the J. D. magnolia. They found the Dunman southwest corner stake, the Strange southeast corner stake, the marked south and west lines of the Strange. These lines carried very old marks and the west line led south from the J. D. magnolia, which was the recognized west line of the Strange, from which railroad survey No. 6 and the Joy were located. A number of witnesses, including surveyors of high reputation, testified to finding these old marked lines, the J. D. and R. D. magnolias. These lines and corners were recognized universally by the various surveyors who did work in that section as well as the owners of the several sur-

veys involved. We think it unnecessary to set out this testimony in detail. It is without dispute, and the only question the state raises with regard to it is its theory that these old lines and corners were marked subsequently to the work of Henderson by others as a result of the original Gregg mistake in locating the southeast corner of the Dunman in the south pond. In 1904 what is known as the landslide subdivision of the Dunman, which cut up the south part of the Dunman into small square tracts, was made by A. E. Stimson, who was then district surveyor. This subdivision was laid out from the south pond corner, and the several tracts composing it have been held since in recognition of the south pond corner line. In like manner a strip extending along the west line of the Stevenson cutting it into small blocks was laid out from the south pond corner, and the owners of the Stevenson and Dunman have uniformly recognized this division line.

In their 1892 partition work the Gillespies found it necessary to locate the east line of the Wilson tract (the east 480 varas of the Strange conveyed by metes and bounds in 1845). J. W. Gillespie testified that the west line of this tract 480 varas west of Strange east line was then witnessed by an old marked line extending from the Strange south line to the river, and that he found a corner 480 varas west of the Strange southwest corner (located from south pond corner).

In the work of the Gillespies in 1892, the father started at the south pond corner and the son was to go to the northwest corner of the Jones, which was pointed out by Jos. Dunman, and they were to meet at the southeast corner of the Jones. At that time there was a recognized excess in width of the Jones. When J. W. Gillespie arrived at the southeast corner of the Jones, as fixed by course from its northwest corner with the recognized excess in its south line—that is, to the intersection of the line running south from J. D. magnolia—he and his father were some 437 varas apart. This was the first time J. W. Gillespie ever knew of an excess in the Jones-Strange jog. This incident is given in the state's brief as the original discovery of this excess. However, the land office map of 1884 shows a considerable excess over field note calls in this jog. The Joy was originally surveyed for A. E. Stimson in 1894, and was resurveyed for Joy by Stimson, as district surveyor, in 1900. The field notes of these surveys give the Jones south line 1,507 varas, an excess over call of 63 varas. The east line of the Joy concededly is a projection of the east line of the H. E. and W. T. No. 6 and is coincident with the marked line running south from the J. D. magnolia.

The following circumstances should be noted with reference to the Mays. The record contains no evidence whatever that any question ever existed prior to the filing of this suit, but that this survey is properly located from the south pond corner. As noted, Mays lived on the survey when he sold it in 1840. Joseph Dunman owned it from 1840 to 1852. In 1851 it was resurveyed by Bringhurst, district surveyor, at the instance of Jos. Dunman, and with Jos. Dunman as one of the chain carriers. In clearing the title through the Mays administration, Henderson, original surveyor of the R. Dunman one-third league, acted as Jos. Dunman's attorney. In 1852, Jos. Dunman sold it to his brother Reason Dunman, the deed reciting that it was "the same premises now occupied by the said Reason Dunman as a homestead." Reason Dunman conveyed it to W. H. Cobb in 1857, and Mary Cobb conveyed 50 acres more or less to Mary Simpson in 1875, and the remaining portion of the labor to B. F. Williams in 1876. The Simpson deed described the land conveyed as "50 acres, more or less, in that part of the above labor which lies on the north side of said Liberty road, which is here deemed a sufficient description." In the Williams deed the labor is conveyed "with the reserve of 50 acres, more or less, taken out of the northwest corner of said land, same being sold and deeded to Mary Simpson of said county, the road leading from Houston to the Tuk-Kaseat ferry on the San Jacinto river being the dividing line of said land." The road referred to in these deeds is concededly the Atascocita road referred to throughout the record and designated on the several maps in evidence. This description of the two tracts into which the Mays was divided by these deeds could not be made to fit even approximately the north pond location, but it does fit the south pond corner location. The Mays was never patented, and in 1892, B. F. Williams, then owner of the Mays title, made application to purchase the land covered by it under the Script Act. In 1894, it was resurveyed under this application by A. E. Stimson, deputy surveyor, under W. A. Polk, county surveyor, on behalf of W. W. Williams, a son of B. F. Williams and grandson of Jos. Dunman. W. W. Williams testified that his grandfather, Jos. Dunman, was one of the chain carriers for Bringhurst in making the Mays survey in 1851, and was present when Stimson surveyed the Williams in 1894, and pointed out to the surveyor the south pond corner as the northeast corner of the Mays and southeast corner of the Dunman; that his grandfather made the statement that Bringhurst in 1851 started at the stake in the pond at the south pond corner, and rode ahead of the Stimson surveying party, and pointed out the lines and corners. It was also shown that the old residence formerly occupied by Jos. Dunman and known as the Cobb residence, which was the same place at which the Gillespies stopped in 1879, was entirely outside the lines of the Mays if located from the north pond. On March 24, 1896, B. F.

Williams sold to Elizabeth Dunman, wife of Jos. Dunman "50 acres of land out of the S. W. corner of the A. Mays labor," which was described as beginning at the "S. W. corner of said A. Mays labor; thence north along the west line of said A. Mays labor 1502 ft. to a stake set in the center line of the Atascocita Road." Manifestly this description will fit the Mays only as located from the south pond corner, since its location from the north pond corner places its southwest corner north of the Atascocita road. When this deed was executed Jos. and Elizabeth Dunman were living upon the land described in the deed.

We shall not further detail the evidence with reference to the lines and corners of the Stevenson, Dunman, and Strange, and will not advert at this time to the controversy over the west line of the Jones, the location of which clearly has no controlling bearing upon the location of the southeast corner of the Dunman.

This brings us to a discussion of the north pond corner location.

We will now examine the evidence upon which is based the state's claim and court's finding locating the Dunman southeast corner in the north pond. The direct evidence relied upon is a supplemental report by Allen that on November 10, 1904, he found the trunk of a fallen gum with a mark resembling C and a living pine with an A 68 rings deep, at this corner relatively so located as to correspond with the Henderson course and distance calls; this evidence is supported by the testimony of Goldman and Bob Bush. The indirect corroborating evidence is the testimony of Nat. Williams and Goldman of finding a pine marked D as a bearing tree for the Mays northwest corner 1,000 varas west of the north pond corner; an oak stump 1,000 varas south of the north pond corner which the state claims and the court found to be the original bearing tree for the Mays southeast corner; and evidence claimed to support the court's findings that the Dunman southwest and the Strange southeast and southwest corners were in 1838 in the woods and not in the prairie as called for by Henderson.

In 1903–04, Bradburn was county surveyor of Harris county and Allen was his deputy. July 19, 1904, Tomey made application to purchase 116.3 acres as isolated scrap land under the Act of February 23, 1900 (Acts 1st Called Sess. 1900, c. 11), on the theory of a vacancy south of the Strange. In his affidavit accompanying this application, which was made before Bradburn as notary public of Harris county, he stated "that I am buying the same for my own use, and that I am not acting in collusion with or attempting to acquire the said land for any other person." The survey was made by Allen and patent issued to Tomey August 5, 1904. Allen's field notes, which are carried forward into the pat-

ent called to begin at a mulberry stake 75 varas east of the northwest corner of the Dunman 160 acres; thence east along north line of H. E. & W. T. No. 6, Dunman 160 acres and E. Ruhl 1,503.88 varas to stake at northwest corner of E. Ruhl; thence north 439⅓ varas passing northwest corner of E. Ruhl at 225 varas along west line of Robt. Dunman to a stake; thence west along south line of Jas. Strange 1,485 varas to stake corner on east line of H. E. & W. T. No. 6, 73 varas south 2½ west of southeast corner of Garrett Joy; thence south 2½ west along east line of H. E. & W. T. No. 6, 440 varas to beginning.

It is to be noted that this survey recognizes the Dunman southwest corner as coincident with the smaller Ruhl most northerly northwest corner, thus locating the Strange south line 214⅓ varas north of the Dunman south line.

On September 20, 1904, Goldman applied to Bradburn to make a survey of land lying between the Dunman, Stevenson, Marshall, and Vickers on the north, David Harris on the east, larger Ruhl, Charles, Mays, and smaller Ruhl on the south, and Tomey on the west. Under this application Allen, as deputy for Bradburn, surveyed 400 acres called to begin at the northeast corner of the Tomey tract and "S. E. cor. of Jas. Strange"; thence north 225 varas to Dunman southwest corner; thence E. "1,444 v. to stake the S. E. cor. of Robt. Dunman," thence north 500 varas along Dunman east line to Stevenson southwest corner; thence east 2,888 varas to Marshall southeast corner; thence south 562¼ varas to north line of Ruhl; thence west 2,888 varas to northwest corner of Charles; thence south 377¼ varas to northeast corner of Williams; thence west 1,444 varas to beginning. On November 10, 1904, Allen surveyed for Goldman a 128-acre tract immediately east of the 400-acre tract. After these surveys were made Allen made a supplemental report, dated November 14, 1904, accompanied by a second map of his work in connection with the Tomey and Goldman surveys. In an affidavit attached to this report he states that "they cut into a fallen gum and a living pine on the S. E. edge of an old pond, and found on the N. E. side of the gum the following mark C at a point near the center of the gum, could not count the rings because of the long time the gum had been on the ground, though the wood was quite solid, but I am sure the mark was over 60 years old, the gum being 8 ft. in circumference with the bark off; that on the pine—on its N. W. side 68 rings deep the mark 'A,' the pine being over 90 years old; as the counted rings proved. The trees were 7½ v. apart (bearings given); this point on the ground is 364 v. N. and 232 v. W. of the present location of the S. E. cor. of the R. Dunman."

The following is to be noted in connection with the Goldman 400-acre field notes and the Allen second map; the field notes and map place the southwest corner of the Dunman due north of the re-entrant corner of the Ruhl, give the south line of the Dunman its full quota of 1,444 varas, locate its southeast corner due north of the south pond corner and locate the north line of the Ruhl and Charles 377¼ varas north of the south pond corner (an impossible location under any testimony in the case). Although Allen claims to have discovered the north pond corner on November 10, 1904, and gives it a position on his second map, which was made November 12, 1904, no change was made in the Goldman 400-acre field notes or in the second map locating the southeast corner of the Dunman other than as in said field notes.

On December 8, 1904, Goldman made application to purchase the 400-acre tract as an actual settler, making the requisite affidavit that he had "in good faith settled thereon and am now a bona fide settler thereon," and "that I am not acting in collusion with others for the purpose of buying land for any other person or corporation, and that no other person or corporation is interested in the purchase thereof."

As the result of the Tomey patent, suit was brought by Tomey against the Paraffine Oil Company et al., in the district court of Harris county, in which a trial before the court (Hon. Chas. E. Ash presiding, and Allen testifying as a witness); judgment was rendered June 21, 1906, in favor of the defendants. We quote from the decree in that case: "* * * And the Court having heard the evidence and having found and determined as a matter of fact that the south line of the James Strange survey is to be found and located as follows, to-wit: By beginning at the southeast corner of the Robert Dunman one-third of a league, at a point marked by an iron pin in the edge of pond south of the public road, and known and spoken of in the community as the 'Alligator Pond,' said southeast corner of the Dunman marked by a gum tree now standing, south 12 degrees, W. 9 varas, with the old mark of a letter 'D' thereon, and the newer mark of the letter 'W' thereon; also marked by a fallen pine tree at a distance from said corner S. 30 degrees West 11 varas, this southeast corner of the Robert Dunman corresponding to the calls in the original field notes of the Robert Dunman, and being the same place recognized for a long period of time as the southeast corner of the said Robert Dunman, and now found by this court to be the true southeast corner of the Robert Dunman."

The court further decreed: "There is and was no vacancy between the said James Strange survey and the E. Ruhl and the other surveys on the south at the time of the issuance of the patent to W. S. Tomey, and that consequently the said patent and location thereof is void and of no force and effect."

A copy of this decree was filed in the land office; the patent was canceled October 19, 1906, and Tomey's money refunded to him.

Another suit in which Allen also testified, filed by Roberta M. Sholl against Goldman, resulted in a judgment upon a jury verdict against Goldman on September 27, 1906. The decree in this case locates the Dunman southeast corner at the south pond, and denies a vacancy. Later Goldman applied for and was refunded his purchase money.

Five other suits were filed involving the Tomey and Goldman locations; and in each, judgment was rendered denying the vacancy. These other suits do not appear to have been contested.

In order to meet the claim of any of the defendants that they were innocent purchasers under these judgments, the state claimed (and the court found) that the Tomey and Goldman locations were absolutely void ab initio, alleging, and, upon what we regard as conclusive evidence, establishing that Bradburn and Allen, in violation of criminal statutes and of their official duty, were acting in collusion with Tomey in purchasing the land; and that Goldman was attempting to defraud the state upon a false affidavit that he was an actual settler and no one was interested with him in the purchase; whereas in fact he was not an actual settler and was associated with one Warnecke who put up the money for the purchase. After Goldman got his refund Warnecke sued him and recovered judgment for his money.

None of these facts developed until after the trials in the two contested cases noted; and Allen's testimony in those cases appeared as that of a disinterested public official.

Other than the testimony of Goldman and Bob Bush the record furnishes no corroboration of Allen's statements concerning the markings on the north pond corner pine tree.

Aside from his interest in the case and the evidence and finding of his fraud, the record discredits Goldman's testimony as unworthy of serious consideration. He testified to being at the south pond corner with Mr. Legg (land office representative referred to later) in 1905. The following quotation is taken from the state's brief: "When they got down there he (Mr. Legg) looked at the pine tree with the old 'A' and the new 'W' at the NE corner of the W. W. Williams at the south pond. We found a pine marked 'A' there, and a forked gum marked 'DJC' and they wanted me to cut into that pine tree and I did so, and cut the 'A' out. I counted the rings and the 'A' was in 27 rings. We also counted the rings of the tree and there was a difference

of opinion in regard to the age of the tree and the number of rings. There was no difference of opinion as to the distance of the 'A' in the tree. They counted 27 to the 'A' and counted 37 to the edge of the tree, but I counted only 35. I did not cut into the gum."

This testimony is positive and unequivocal that Goldman himself cut into the A pine at the south pond in 1905. It was shown conclusively by every other witness who testified on the subject that at that time this pine was gone and only the stump remained. Even Allen, in his report of his visit the year before, states that "the pine called for had been removed so long that the stump had well nigh rotted away."

The other corroborating witness, Bob Bush, testified that he was with Allen's surveying party in 1904, and saw a D on the gum and an A on the pine; that he cut into the pine and counted 68 rings as the depth of the A and 90 rings to the center of the tree.

The testimony of this witness, which was by deposition, was of such a character as to render it of slight, if any, probative force, even without questioning his veracity. He was unable to read or write, and could not draw an A, and admitted on cross-examination that he only knew the mark was an A because Allen told him so. He could not count 100 consecutively, but could only count to 50, and then start over. His testimony as to other marked lines, corners, and physical objects was wholly at variance with that of all other witnesses testifying upon the subject, and was manifestly incorrect, and he admitted that his evidence in these regards was based upon statements of Allen. It had been 22 years since the occurrences to which he testified, and he stated on cross-examination, after denying that he had talked to counsel about his testimony: "I am telling it for the first time on the witness stand today." The evidence shows that the estimation of the age of trees by counting the rings is a subject requiring some experience or expert knowledge, and the witness was not shown to have had either.

This, in substance is the evidence, viewed most strongly for the state, bearing directly upon the north pond corner location.

The indirect or corroborative evidence of the north pond location is: (1) an oak stump at the state's southeast corner of the Mays; (2) the testimony of Nat Williams and Goldman to a marked bearing pine at the state's northwest corner of the Mays; and (3) evidence discrediting the defendants' Dunman southwest and Strange southeast and southwest corners as being in the woods, and not in the prairie in 1838.

The oak stump, though properly located, was not shown by the testimony of any witness to be a bearing tree.

The Mays called for a D pine as a bearing tree for its northwest corner, and the evidence showed that there was a pine stump properly located for a corner at 1,000 varas west of the north pond corner. Nat Williams testified that in 1904 he cut fire wood for the Williamson schoolhouse and for Martha Williams, and that late one evening when he had finished his work for the day Goldman came up to him and asked him if he knew he was cutting wood on Goldman's land; to which he replied that he was supposed to be cutting on the A. Mays, and that, if Goldman had any land in there, "it was news to him." He claims to have found a pine with a plain D on it, and after he had cut it down and while he was splitting it up into blocks he and Goldman discovered a mark and they put the blocks together and found the mark to be a D. Goldman asked him to give him the blocks and he did so. He said they counted the rings on the block but could not remember the number. The testimony of this witness is extremely difficult to follow in many respects, and is subject to many of the objections noted in connection with that of Bob Bush. The location of this pine he leaves extremely doubtful. If he was in fact on the Martha Williams land, or even near it, he was some 400 varas south of the state's northwest Mays corner. Goldman, who alone testifies to the depth of the marks, says he showed the block to his attorneys in the Sholl case, but they discarded the evidence as having no probative value.

We have carefully examined the evidence bearing upon the issue of whether the defendants' Dunman southwest and Strange southeast and southwest corners were in the woods and not in the prairie in 1838, and fail to find that, taken in its strongest light for the state, it shows that there were trees old enough to have been there in 1838, and sufficient in number or proximity to either of these corners to discredit a prairie description. The most that it shows in this regard is that at some of these corners there was scattered timber, not necessarily inconsistent with the prairie call. It is to be noted, in this connection, that Gregg recites in his field notes of the smaller Ruhl, finding the Dunman southwest and Strange southeast corner stakes, and, while he gives a bearing tree for the Dunman southwest corner, it is 49 varas distant from the corner stake. A bearing tree is also given for the Strange southeast corner, but it is 53 varas distant from the corner stake. This was 22 years after Henderson's survey, and the fact that these were the nearest trees which Gregg could find to these corners at that time corroborates rather than discredits the prairie designation by Henderson.

The above is the substance of the evidence of the north pond location viewed most strongly in favor of the state. In the view we take of it, hereafter discussed, we deem it unnecessary to detail the various particulars the defendants urge as discrediting Allen's location

of this corner, and in the interest of brevity we pretermit them. It should be noted, however, that Hugh Slaughter, the only other witness who testified to the marks on Allen's A pine, and who was with the Allen party, contradicts the Allen report and testimony of Goldman and Bush regarding the marking. His testimony, while criticised by the state, does not appear in any sense more vulnerable than that of Bush.

Subsequently to the Tomey and Goldman judgments repeated efforts were made by parties interested in the vacancy to induce the Attorney General's department to bring suit in the name of the state.. All of these efforts were fruitless. In 1916 during the administration of Attorney General Looney, the department made a thorough investigation of the controversy through Assistant Attorney General Smedley, whose high standing for integrity and legal ability, especially in litigation of this character, is well known to the appellate courts of this state. Mr. Smedley made a detailed report of his investigation and findings, which was approved after round table consultation of the Attorney General and his corps of able assistants. This report shows to have been very thorough, and the conclusion was reached that reasonable basis for such suit did not exist. In his report Mr. Smedley states with reference to the S. pond location: "This corner is regarded as one of the most positive and definitely fixed corners in that portion of Harris County."

█ The theory of the state is that the recognized and found west line of the Jones controls in locating the lines and corners of the other surveys to the east. This would be true if there were no better locative method available. But this is not the case here, and more especially so with reference to the Dunman southeast corner. Nor does the state or the court locate this corner or the Dunman south line or southwest corner from the Jones east line; but, to the contrary they base their location on the north pond corner which is 47 varas north and 60 varas west of where it would fall by course and distance from the state's and court's Jones northwest, and southeast corners. Once the footsteps of the original surveyor are definitely traced to a particular location, course and distance calls from other points must yield. This principle is as well established by adjudication in this state as any principle in boundary law.

As stated, we do not attach any importance to the court's location of the Jones west line, which unquestionably is supported by ample evidence. The state concedes that this location rests upon recognition; and that (quoting from its brief) "it is true that our N. W. corner of the Jones 'a sycamore on the south bank of said river marked "J B" four pointing trees blazed' washed away before absolute certain identification." Much sig-

nificance is attached by the state to a deed in 1846 witnessed by Henderson, conveying the west one-third of the Jones. But as no metes and bounds are given in the deed, the fact that Henderson witnessed it seems of no importance. It *is* significant, however, in connection with the location of the Jones east line that the east line of this tract is well recognized and is some distance to the east of where it would be properly located from the state's west line if given only its proper area. Its east line's undisputed location more nearly accords with the J. B. magnolia location of the Jones east line than with the state's and court's Jones east line, which is based solely on call and distance from their Jones west line. The state also attaches much significance to the Joy as supporting its location of the Jones west and south lines. The Joy calls for an excess of 63 varas in the Jones south line, and its east line accords with the J. B. Magnolia east line of the Jones. The state contends that the court's southeast Jones corner is located solely by course and distance call from its northwest corner, and disposes of the court's (unsupported) finding with reference to the black jack tree marked X and the black jack grove by the statement that this finding "is rather one relating to recognition in general vicinity and nothing more."

While the evidence points very strongly, if not in fact conclusively, to the J. D. magnolia location of the Jones east line, the location of that line manifestly cannot control the location of the Dunman southeast corner, and an extended discussion of this issue would be unprofitable.

█ The only other finding of the court which we think should be noted is the 19th, which is to the effect that ("as affecting the location of the San Jacinto river in 1838") by connecting the court's Jones northwest with the Mary Owens southwest corner, and the court's Dunman east line intersection of the present S. bank of the river with the Votaw southwest corner, the Jones, Dunman labor, Strange, and Dunman, south of the river and the Votaw and Owen north of the river contain the quantity of land called for in the original patents, after allowing for the area in the river bed. How this fact could have any material bearing upon the river changes since 1838 we are unable to see, especially in view of the conclusive evidence above detailed showing the greatest possible limits of such changes. The evidence as to this area is taken from calculations made by Guerringer, based upon his own work in the surveys south of the river and that of other surveyors upon the two surveys north of the river. Guerringer gives the aggregate excess over patent calls as 39.8 acres, including the river bed. By adopting the south pond corner, he increases this gross excess to 514.5

acres. While we do not regard this latter excess as material, even if it were shown to be based upon accurate data concerning the original survey lines and corners, the following may be noted. The Owen was a league survey (not made by Henderson) with a base (north line) of 2,500 varas. Its east and west lines should therefore aggregate 20,000 varas, if meanders in the river were not taken into account in calculating its area. The calls for those lines aggregate 19,755 varas, a shortage of 245 varas, which shows that the surveyor, unlike Henderson, did take into account the river meanders in calculating area. Additionally there is an excess in measured distance used by Guerringer over calls in each of the three lines of this survey, as follows: In the west line (D 9,458⅓–C 9,406) an excess of 52⅓ varas; in the north line (D 2,519–C 2,500) an excess of 19 varas; and in the east line (D 10,385–C 10,349) an excess of 36 varas. There is also an excess of 22 varas in the Votaw east line. The Owen-Votaw common line involves another complication. The river corner of this line is at the admitted recent avulsive change to the north of the Dunman. If this common corner were placed upon the present north bank of the river, it would have an excess of over 400 varas. In an earlier case the state sought to recover the area between the present north bank and the called distance on the theory that it constituted an island in 1838. We are not advised of the final result of that litigation. Again, Henderson took no account of river meanders in his calculations of area in the four surveys south of the river. These established facts demonstrate the unreliability of this character of evidence. Independently of this, however, the evidence has no probative force. Each of the surveys south of the river was independently owned. Its established lines and corners cannot be shifted, by this character of evidence; nor can a reduction of its area be upheld by additions to adjacent surveys. However, even taking Guerringer's figures at their full face value, their significance is inconsequential. An excess of less than 500 acres in surveys made in 1838 bordering on a river and aggregating 10,332 acres (an error of less than 5 per cent.) is no more than would be reasonably expected. Our reports are replete with examples of excesses in early surveys of considerably greater proportion than that claimed by Guerringer. We advert to this subject only on account of the prominence the court gives it in his findings.

The state contends that a scaling of the land office maps supports its theory of location, and that evidence concerning a block claimed to have been cut by Legg from the D gum at the south pond corner discredits it as a Henderson marking. The court's findings do not mention these subjects, but we will consider them briefly.

The land office maps are not shown to have been compiled other than from field notes of surveys filed in that office, and it is manifest that the records of that office have been combed, both by the state and defendants, for every particle of evidence which could have bearing on this case. All parties have been liberal in offering all of such evidence which might conceivably aid in establishing their respective claims and theories. We find nothing of substance in these maps which gives any support to the state's claims or theories, which is not found in the record evidence which we have discussed. These maps do show, however, the following: That as early as 1847 (before the Bringhurst 1851 survey) the Mays was recognized as laid out from the Dunman southeast corner; that as early as 1884 a considerable excess was recognized in the Jones-Strange jog; that the Dunman-Stevenson jog was always recognized as approximately 500 varas, and never as approximating only 70 varas; that in the 1847 and 1861 maps the Stevenson northeast corner is placed north of the Jones northwest corner approximately its distance (280 varas) arrived at by following the Henderson course and distance calls; that the 1884 map (the first to recognize an excess in the Jones-Strange jog) and the 1893 map locate the Stevenson northeast corner considerably south of the Jones northwest corner. We attach no significance whatever to a mere scaling of these maps, and the trial court evidently took the same view.

The Legg D gum block matter, briefly stated, was: Legg was a land office examining draftsman who investigated the vacancy claimed in connection with the Tomey and Goldman file in 1904 and 1905. In his report he rejected the south pond location of the Dunman southeast corner upon what he regarded as discrepancies between the Henderson and the Williams (1894) survey markings on the pine and gum (the positions of the trees he found correct). He gives the Williams call as A (old) and W (new) for the pine, and D. J. C. (old) and W. (new) for the gum. The W (new) on each tree was clearly not Henderson's marking, but was placed there in 1894 to mark the Williams. Legg manifestly regarded the J. C. (J. G.) as connected with the D and of the same age, not knowing that J. J. Gillespie placed the J. G. below the D in 1879. The state offered testimony that Legg, as a witness in the Sholl case, produced a block which he claimed to have cut out of the D gum, and which Legg testified showed a more recent date than Henderson's marks could have had. It was not shown what part of the tree it came from or what marks it carried. Manifestly, if Legg cut only from the J. G. mark, which his report shows he regarded as part of a D. J. C. mark, it would have no bearing on the authenticity of the D. The defendants ob-

jected to the evidence, and offered to show in rebuttal that other witnesses had testified in the Sholl case that the markings on the block, whatever they were, were old enough to have been made by Henderson. The court excluded this testimony with the qualification that he did not consider the evidence in chief in rendering his decision. Clearly, we think the court disregarded the evidence as of no probative value—a view in which we concur.

While the briefs contain very elaborate discussions of law points and authorities; in the main the legal questions involved in the conclusions which, in our view, control the case, are so elementary as not to require citation.

We will discuss only briefly some of the law points presented.

■■ The state contends that the judgments in the Tomey and Goldman suits are not binding upon the state, and are therefore as to the state not competent evidence in locating the boundaries involved. We do not agree with this holding The general rule of law relied upon is that a judgment is binding only as to those party or privy to it. In the establishment of ancient boundaries, however, a relaxation of the strict rules of evidence, ordinarily applied in establishing other facts, is frequently met with. See Texas Jurisprudence, vol. 7, pp. 209, et seq.

In Porter v. State, 15 S.W.(2d) 191 (error refused) this court held (Justice Baugh writing) that, "though the parties to and lands involved in two actions are different, yet the same original surveys, boundary lines, and acts of the same surveyors, which determine the second action, having been involved in the other prior action, the determination of those matters by the highest court of the state in the prior action are binding and conclusive in the subsequent action, not as res judicata, but under the doctrine of stare decisis." (Quotation is from the syllabus.) The record here shows that in the two contested cases, which were tried more than 20 years before the trial of this case and involved the same boundaries here in issue, a number of witnesses, now deceased, had testified, and much evidence had been obliterated, due to intensive oil development, fires, etc. While the above announced rule of stare decisis only applies to the decisions of the Supreme Court, we think the judgments of the trial courts, under the circumstances shown, were admissible as circumstances along with other shown recognition. We do not, however, predicate our holding on these judgments. Our conclusion would be the same had the issues never been previously adjudicated.

Defendants claiming through purchase from the Paraffine Oil Company subsequently to the Tomey judgment assert that they are bona fide purchasers under that judgment and entitled to protection as such. The state contends, and the court concluded, that the Tomey patent would not support the plea of bona fide purchaser, because it was void ab initio on two grounds: (1) because the land was adversely held and possessed, and therefore was not subject to the Tomey location; and (2) because of Tomey's collusion. The defendants affected urge, in substance, the following counter propositions and supporting authorities:

■ 1. That the plaintiff in the Tomey judgment acquired thereby all the title Tomey had. Houston Oil Co. v. Village Mills Co. (Tex. Com. App.) 241 S. W. 122; French v. Olive, 67 Tex. 400, 3 S. W. 568; Hoodless v. Winter, 80 Tex. 641, 16 S. W. 427; Houston & T. C. Ry. Co. v. McGehee, 49 Tex. 482; New York & T. Land Co. v. Votaw (Tex. Civ. App.) 52 S. W. 125; Latta v. Wiley (Tex. Civ. App.) 92 S. W. 433; McAllen v. Crafts (Tex. Civ. App.) 139 S. W. 41; Dunn v. Land (Tex. Civ. App.) 193 S. W. 698; Taylor v. Loan Co. (Tex. Civ. App.) 265 S. W. 403; Woodley v. Becknell (Tex. Civ. App.) 214 S. W. 932.

■ 2. That the undisclosed collusion of Tomey could not defeat their rights as bona fide purchasers of the apparent title passing by that judgment. State v. Hughes, 97 Tex. 520, 80 S. W. 524; Wimberly v. Pabst, 55 Tex. 592; Bogart v. Moody, 35 Tex. Civ. App. 1, 79 S. W. 633 (writ refused).

■ 3. That if the south line of the Strange was in fact where found by the court, the land was subject to location regardless of the found adverse possession and claim. Maddox Bros. v. Fenner, 79 Tex. 290, 15 S. W. 237; Adams v. Ry., 70 Tex. 269, 7 S. W. 729; McLeary v. Dawson, 87 Tex. 524, 29 S. W. 1044; Yochum v. McCurdy (Tex. Civ. App.) 39 S. W. 210.

We have examined these authorities and have reached the conclusion that they support the stated counter propositions. However, this conclusion only affects a part of the land involved in the appeal, and for that reason we will not burden this opinion with more than a bare statement of the issues presented and our conclusions thereon.

■ Defendants objected to the Allen supplemental report and now urge its inadmissibility. The state contends that it was admissible (1) as a public record of an official act; and (2) as the declaration of a deceased surveyor.

The collusion pleaded by the state and found by the court certainly destroyed all official character of the report. As a self-serving declaration of an interested party while engaged in a fraudulent scheme to acquire the land from the state, every consideration of public policy and reason should deny its admissibility. None of the authorities upon which the state relies as supporting the admissibility of declarations of interested par-

ties goes to the extent of warranting the admission of this report. Our conclusions, however, are not in any way rested upon the exclusion of this report as a matter of law and we therefore deem it unnecessary to review the authorities or elaborate our views. See Texas Jurisprudence, vol. 7, §§ 78 and 79, pp. 236, et seq.

In conclusion: It is apparent that the controversy. here involved arose out of a mistake in Henderson's work of some 400 varas, somewhere between the Dunman labor northeast and Simonds northeast corners. The earliest evidence of discovery of this mistake is found in the land office map of 1884, wherein the mistake is accounted for by lengthening the Jones-Strange jog. Uniformly, since that time the error has been located in this jog. The state's theory of avulsive change at the Simonds northeast corner is negatived by undisputed evidence and the court's express finding. The court locates this error in the Dunman-Simonds jog (reducing a 520-varas call to 70 varas), which is demonstrably untenable. Lengthening of the Jones-Strange jog at least 260 varas is subject to plausible explanation, while the contrary is true of shortening the Dunman-Simonds jog 450 varas. The record fixes, indisputably, the Dunman southeast corner true location at the south pond corner, both by identification of the original marked bearing trees called for by Henderson, and an unbroken chain of evidence of recognition of that corner extending from 1840 to the present time, and recognition of other lines and corners of the Stevenson, Dunman, and Strange beyond the memory of the oldest living witness, and by declarations of others back to the remotest times. The evidence supporting the north pond corner is not of such a character as to overturn this evidence. It originated in a fraudulent conspiracy, in which the public officials involved violated their official oaths and express provision of the criminal statutes, one of them acting officially as a notary in taking an affidavit which he knew to be false. The north pond location cannot be reconciled with the court's finding that the Stevenson south line is coincident with the Charles north line, under any reasonable hypothesis; and that finding rests upon conclusive evidence. No evidence (outside of the Allen report and the testimony of Goldman and Bush, which we hold insufficient both in law and fact to overturn the south pond corner location) was given of any markings or

recognition of the lines or corners based upon the north pond location. The theory of avulsive change in the river since 1838 is not supported by the evidence and is entirely broken down by the finding (based upon uncontradicted evidence) that no such change existed at the Stevenson northeast corner. The theory of Gregg's mistake rests purely on conjecture, and finds no support in the evidence. The reduction of the Dunman-Simonds jog from 520 to 70 varas presupposes a mistake by Henderson so gross as to require convincing proof to sustain it; yet of it there is no evidence.

The public policy of this state, as announced in repeated decisions, demands the security of land titles emanating from the state, and, where ancient boundary lines have been recognized for long periods of years, they will not be lightly disturbed, to the detriment of those who have dealt upon the faith of them. The record here conclusively shows that, as stated by Mr. Smedley, the south pond corner "is regarded as one of the most positive and definitely fixed corners in that portion of Harris County." Property rights, extending into the millions of dollars, are based upon that location and its recognition. Public policy and every consideration of right, justice, and fair dealing demand that this location should not now be destroyed except upon the most cogent and compelling evidence. Not only does the evidence here not meet that test, but it does not meet any reasonable test which would commend it to serious probative consideration in the face of the evidence supporting the south pond corner location.

We conclude that the south pond corner is established as the true southeast corner of the Dunman one-third league, and that therefore no vacancy exists (1) conclusively as a matter of law, and (2) factually from so overwhelming a weight and preponderance of the evidence as to require a reversal in the interest of justice.

The trial court's judgment, in so far as appealed from by defendants Blaffer et al., is reversed, and judgment is here rendered that the state take nothing by its suit against said defendants or any of them. As to. cross-acting defendants the trial court's judgment is affirmed. In other respects the trial court's judgment is not disturbed.

Reversed and rendered in part, and in part affirmed.