## KIRBY LUMBER CO. et al. v. ADAMS et al.

### No. 2083.

Court of Civil Appeals of Texas. Beaumont.
Dec. 24, 1932.

On Rehearing, May 10, 1933.

On Second Rehearing June 26, 1933.

Williams, Lee, Hill, Sears & Kennerly, of Houston, Lewis Lanier, of Jasper, and Andrews, Streetman, Logue & Mobley, of Houston, for appellants.

Adams & Hamilton, of Jasper, J. T. Adams, of Orange, Roi Blake, of Jasper, and Howth, Adams & Hart, of Beaumont, for appellees.

LAWHON, Justice.

This is the second appeal in this case. The opinion of this court on the former appeal is found in 291 S. W. 279.

On the 24th day of May, 1836, David G. Burnett executed a power of attorney to Thos. Tobey of New Orleans, La., appointing him as agent of the Republic of Texas, to sell public lands of Texas for the purpose of raising money for the government. Thos. Tobey, under this power of attorney, issued scrip for certain lands, and in 1839 B. F. Mott, deputy surveyor of Jefferson county, surveyed for holders of this scrip a number of sections of land lying immediately north and south of the boundary line between Jasper and Orange counties. These surveys are known as "the Tobey scrip surveys." There are two tiers of these surveys south and adjoining the county line in Orange county, and three tiers immediately north of the county line in Jasper

county. The George Uhler survey of the Tobey scrip surveys is the southwest section in Jasper county. The Wm. F. Harrison lies immediately north of the George Uhler, and the Samuel Hentzelman survey lies immediately north of the Wm. F. Harrison. Practically all of the sections in the Tobey scrip surveys are 1,900.8 varas or one mile square.

This suit involves the title to what is known as the W. J. B. Adams survey of 644.5 acres in Jasper county, and also involves the value of certain timber claimed to have been removed from this land. It is the contention of the appellees that the Adams survey lies between the George Uhler, the Wm. F. Harrison, and Sam Hentzelman surveys, on the east, and Texas & New Orleans sections 81 and 82 on the west. The appellants contend that the Adams survey is located upon the Uhler, Harrison, and Hentzelman surveys, and, they being prior grants, the Adams patent was void. They further contend that if it should be held that there was a vacancy between the Hentzelman, Harrison, and Uhler surveys and Texas & New Orleans sections 81 and 82, that most of this land was appropriated under a location of a land certificate issued to Eva Lancaster and transferred to W. H. Smith. The court submitted to the jury only one issue, and that was the true location of the west line of the George Uhler survey. This issue necessarily determined the west line of the Wm. F. Harrison and the Samuel Hentzelman, as these surveys were immediately north. A jury found in favor of appellees' contention as to the location of this line. The land in controversy is 785 varas in width, and according to the contention of appellees it is this distance between the Tobey scrip surveys and Texas & New Orleans sections 81 and 82. Judgment was entered in behalf of appellees on the verdict of the jury as to boundary, and in behalf of appellants as to any timber cut and removed from such land.

█ Appellants very vigorously assert that there was no issue for the jury as to the location of the west line of the Uhler, and necessarily the west line of the Harrison and Hentzelman surveys, and that a verdict should have been instructed in behalf of appellants. The Edward Hurst survey appears to have been the first of the Tobey scrip surveys located. This is the extreme west survey in Orange county, and according to the field notes, it lies eight miles east of the Neches river; its north line being the county line. Two pine bearing trees are called for at each corner, and, as before stated, this is a section one mile, or 1,900.8 varas, square. This survey was made on July 14, 1839. On November 19, 1839, the George Uhler section in Jasper county was surveyed by B. F. Mott, the same surveyor, and the field notes of this section calls for the same bearing trees on the county line for Uhler's southwest and southeast corners as are called for in the Edward

Hurst field notes for its northwest and northeast corners. The George Uhler field notes also call for two pine bearing trees at its northwest and northeast corners. In most, if not all, of the Tobey scrip surveys, bearing trees are called for at all corners. The field notes of the Edward Hurst survey calls for its location as eight miles east of the Neches river, while the patent of the George Uhler calls for its location as 13,325 varas east of the Neches river. All the maps introduced by both parties show the George Uhler to be located immediately north of the Edward Hurst. In April, 1876, Texas & New Orleans sections 81 and 82 were surveyed by James Ingalls, deputy surveyor for Jasper county. L. D. Scarborough was district surveyor. According to the field notes, Texas & New Orleans sections 81 and 82 lie immediately west of the Tobey scrip surveys, as these field notes call for the east line of Texas & New Orleans section 81 as being the west line of the Harrison and Hentzelman surveys, Texas & New Orleans section 82 calls to start at the southwest corner of Texas & New Orleans section 81 on the west line of the Harrison survey, and runs south 405 varas, to the southwest corner of the Harrison, and thence south 2,726 varas to a stake on the west line of the Edward Hurst survey, with bearing trees definitely called for. The original field notes and the original maps of the land office and of Jasper county show no vacancy between the Tobey scrip surveys and Texas & New Orleans sections 81 and 82. It is conceded that the southwest corner of Texas & New Orleans section 82 is definitely located. Roi Blake, a witness for appellees, being a surveyor and attorney, testified that the admitted southeast corner of Texas & New Orleans section 82 was in the west line of the Edward Hurst survey. All witnesses testified that there were evidences of old corners, in accordance with the contention of appellants, at all corners of the George Uhler survey, and the south corners of the Uhler were identical with the north corners of the Edward Hurst. The J. D. Thomas tract was a triangular piece of land out of the north part of the James Ryan tract, one of the Tobey scrip surveys. This tract was on the boundary line between Orange and Jasper counties, and the west corner of the Thomas, according to the contention of the appellants, is the southeast corner of the George W. Duncan, an adjoining survey on the east, to the George Uhler. There are evidences of an old corner at this place that supports the contention of appellants. There are other evidences of old lines, and from pieces taken out of trees, they indicate these lines were made in 1839 when the Tobey scrip surveys were made. We shall not attempt to go into the details of the evidence as to the proper location of these surveys.

Appellees introduced evidence showing some old lines and some old corners, which

tended to support their contention. We also refer to the former opinion in this case.

This court, in the former opinion, held that there was evidence to go to a jury and support a finding in favor of appellees. The writer was not a member of this court at the time of that decision. The majority of the court is of the opinion that the evidence on this issue was substantially the same as now before us on this appeal, and are of the opinion that there was a question for the jury as to a vacancy between the surveys above referred to. The writer is of the opinion that the overwhelming weight and preponderance of the evidence is in favor of the contentions of the appellants, and that the trial court should have instructed a verdict in their favor. Blaffer v. State (Tex. Civ. App.) 31 S. W.(2d) 172. In deference to the former opinion, the court holds that there was an issue for the jury on this question.

On November 21, 1887, W. W. Blake, county surveyor of Jasper county, made a survey of the 840 acres of land for W. H. Smith, as assignee of a land certificate issued to Mrs. Eva Lancaster. The field notes of this survey makes the beginning corner start on the west line of the Samuel Hentzelman survey, at a stake 156 varas from the northwest corner, and runs south to a stake in the west line of the Uhler, 373 varas north of its southwest corner. This survey then runs west 785 varas to a stake in the east line of Texas & New Orleans section 82, this point being 373 varas north of the line between Jasper and Orange counties, and 994 varas north of the southeast corner of Texas & New Orleans section 82, and from this point runs north 5,171 varas and thence east 785 varas to the place of beginning. These field notes were duly filed and recorded in the county surveyor's office of Jasper county, and also in the office of the land commissioner of the state of Texas. These field notes cover all of the land in controversy except a tract 373 varas by 785 varas immediately north of the county line, between the George Uhler survey and Texas & New Orleans section 82, according to theory of appellees. The evidence discloses that there was an attempt to float the Eva Lancaster certificate from this location to Orange county, and that it was located in Orange county and a patent issued. The record of the land office and the maps there showed that the Eva Lancaster was in conflict with the Uhler, Harrison, and Hentzelman surveys. The appellants contend if there was a vacancy, the certificate in favor of Eva Lancaster, by reason of the survey and the filing of the field notes, was merged into the land and it could not thereafter be legally floated. Appellants own whatever rights were acquired under the Eva Lancaster certificate and location.

In Chaison v. Stark (Tex. Civ. App.) 29 S. W.(2d) 500, on page 504, Judge Walker, now

Chief Justice of this court, said: "Under the law in force when the land in controversy was surveyed under Certificate No. 147, the only cause for which a certificate, when once filed on land, could be floated and located elsewhere, was upon a showing that the location was in conflict with an older title, and then only to the extent of such conflict. New York & T. Land Co. v. Thomson [83 Tex. 169, 17 S. W. 920], supra. Under these authorities it is clear that any subsequent floating of this certificate, after a valid location, was illegal. So appellants' proposition rests upon the legality of their survey." While the Supreme Court reversed this court in the Chaison Case, it did not disturb the statement of law above quoted.

Adams v. Railway Co., 70 Tex. 252, 7 S. W. 729; New York & T. Land Co. v. Thomson, 83 Tex. 169, 17 S. W. 920; and other cases are in point and support the conclusion reached by this court in the Chaison v. Stark Case. Appellees say that these cases are not in point, as they arose under a prior statute, and that an act of the Legislature approved on July 5, 1879, applies. This statute is found in Gammel's Laws of Texas, volume 9, p. 52. We are of the opinion that this statute in no way changed the law with reference to floating land certificates after they had been located upon unappropriated public domain.

Appellees further contend that even if this 1879 statute did not give them the right to float the certificate, the presumption would be that it was floated with legal authority, by reason of the long lapse of time. This court cannot indulge in presumptions that are contrary to the facts. The appellees, in the trial of this case, admitted in open court that at the time of survey of the Eva Lancaster, the land involved "was public domain subject to location within the meaning of the law, at the time the same was surveyed, by the field notes of the survey thereof."

It is the opinion of all members of this court that the location under the Eva Lancaster survey appropriated all land involved in this suit in conflict with the W. J. B. Adams. The Adams survey was located and patented subsequent to the survey of the Eva Lancaster. The Adams survey begins at the southwest corner of the Uhler and runs north 5,204 varas, taking in all vacant land, if there was a vacancy. This strip was 785 varas wide.

It is our opinion that the judgment of the trial court should be reversed and rendered as to all the land in controversy except a tract at the south end of the W. J. B. Adams survey, 373 varas by 785 varas, not in conflict with the Eva Lancaster tract, and it is so ordered. It is further ordered that as to the last-mentioned tract, the judgment of the trial court is affirmed.

Affirmed in part, and reversed and rendered in part.

On Rehearing.

COMBS, Justice.

On motion for rehearing a majority have reached the conclusion that our court was in error in holding that the Eva Lancaster certificate was not legally floated. Chief Justice WALKER dissents from this view, believing that the original holding is correct.

The Eva Lancaster certificate was floated April 14, 1891. The statute in force at that time relating to the floating of land certificates was article 3888, R. S. 1879 (as amended by Acts of 1879 [Sp. Sess.] p. 20, c. 23). This article became article 4124 of Revised Statutes 1895, and is as follows: "Art. 4124. (3888) Whenever the field-notes of a survey have been returned to the general land office, and upon examination the same are found to be in conflict with previous claims, it shall be lawful for the rightful claimant of the certificate so located in conflict to file his affidavit with the commissioner, setting forth that the certificate was not intentionally so located in conflict, but that he believed at the date of such location that the land covered thereby was vacant and unappropriated public domain; to abandon said survey and surrender all claim thereto by reason of the file, entry and survey made by him, and to receive from the commissioner a copy of the certificate on which the same was based, if such certificate be valid and genuine; and it shall be the duty of the commissioner to indorse upon the said copy that the original certificate is floated; and the county where the land is situated which is covered by such floated certificate, and that the copy is given in lieu of the original, but without any prejudice to the rights of any person by virtue of said certificate, and that the said copy may be located upon any unappropriated or vacant land."

The certificate was first located by survey made November 21, 1887, for W. H. Smith, assignee of Eva Lancaster; the survey, as made, being in Jasper county and covering all but about 52 acres of the land in controversy. The field notes of that survey were properly recorded in the surveyor's records of Jasper county and were, with the certificate, properly filed in the General Land Office of Texas on January 20, 1888. By regular transfer the Beaumont Lumber Company became the owner of the certificate and on April 13, 1891, filed in the General Land Office an application to float it on the ground of conflict. The affidavit of John N. Gilbert, secretary and treasurer of the company, sets forth that the company was the lawful and rightful claimant of the certificate; that said certificate had been located in conflict with older surveys; that it was not intentionally so located in conflict, but that it believed at the date of such location that the land covered thereby was vacant and unappropriated public domain.

The record shows that J. J. Copley, acting as agent for Beaumont Lumber Company, under power of attorney which empowered him, among other things, "to obtain and receive duplicate copies of land certificates which it may be entitled to under article 3888, Revised Statutes," received from the land commissioner certified copy of the certificate on April 14, 1891. The copy was laid by Beaumont Lumber Company on 640 acres of vacant land in Orange county, and patent to that land was issued by the state to Beaumont Lumber Company, assignee of Eva Lancaster, by patent dated September 8, 1891. Appellants now own the Orange county survey, through conveyance from Beaumont Lumber Company. The original certificate on file in the land office bears the notation, "a copy of this certificate issued and delivered to J. J. Copley for re-location April 14, 1891, W. L. McGaughey." In his certificate attached to the copy McGaughey, the land commissioner, recited that "the field notes of a survey located in Jasper County, made by virtue of aforesaid certificate having been returned to this office and having been found to conflict with older, valid surveys, this copy is floated in lieu of the original certificate for re-location; but without prejudice to the rights of any persons by virtue of said certificate in accordance with article 3888, R. S." The file jacket in the land office bears the indorsement: "According to State Surveyor Scarborough's certified sketch and statement filed Nov. 3/90 this is entirely covered by the patented survey of Sam'l Heintzelman S–7; W. F. Harrison S–12 & Geo. Uhler S–23. April 14/91. C. M. Hill."

We believe that the legality of the floating of the Eva Lancaster certificate cannot be raised in this case. It is a well-recognized principle of law that orders or judgments of quasi judicial tribunals, pronounced while acting within their powers and upon matters over which their jurisdiction has been invoked, are not subject to collateral attack. Mr. Freeman, in his work on Judgments, says: "An order or judgment is none the less conclusive collaterally because it was pronounced by an inferior court or by a quasi-judicial tribunal. When acting in their powers and upon a matter over which their jurisdiction has been invoked, they have the same right under the law to make determinations which shall be free from collateral impeachment as tribunals of superior powers. It is true the same presumptions as to jurisdiction do not support their judgments as pertain to courts of record, and that nothing will be intended to be within their jurisdiction but what expressly appears to be so; but when the fact of jurisdiction appears the usual presumptions as to regularity of action and validity of decision attaches and their decisions made with jurisdiction over the subject matter and the parties are fully protected from

any attempt to impeach them collaterally." Freeman on Judgments (5th Ed.) vol. 1, p. 855.

■ This rule against collateral attack applies to quasi judicial acts of an executive officer of the government, as well as to judgments of inferior courts. In the early case of Allen v. Blunt, 3 Story, 742, 745, Fed. Cas. No. 216, Judge Story states the rule to be that "where a particular authority is confided to a public officer, to be exercised by him in his discretion upon an examination of the facts, of which he is made the appropriate judge, his decision upon these facts is, in the absence of any controlling provisions, absolutely conclusive as to the existence of those facts." While it would not be accurate to say that such decisions of executive officers are held to be "absolutely conclusive" in this state, nevertheless our courts have uniformly held them to be conclusive on collateral attack. Cases illustrative of the holding of our courts on this question will be cited and discussed hereinafter. Such being the rule, the question to be here decided is: Was the act of the land commissioner in permitting the floating of the Eva Lancaster certificate of that judicial or quasi judicial character which makes his finding of the fact of conflict conclusive in this case in so far as that matter may affect the validity of such act? The answering of this question involves the construction of article 3888, above quoted, with particular reference to the nature of the powers conferred by it upon the Commissioner of the General Land Office.

■■ The statute made it lawful for the rightful claimant of a land certificate which had been laid in conflict with previous claims to abandon the location and receive from the land commissioner a copy of the certificate for relocation. As a prerequisite to his right to float the certificate, the claimant was required to file his affidavit with the land commissioner setting forth certain facts, which entitled him to float it. The statute empowered the land commissioner to permit the floating of the certificate and issue the certified copy for relocation when the requirements of the statute authorizing the floating of land certificates had been complied with by the claimant. The statute therefore necessarily placed upon the commissioner the duty of passing upon the facts which formed the basis of his right to allow the certificate to be floated, and this certainly included a finding of conflict. An executive officer acts in a quasi judicial capacity when, in the exercise of his functions, he is required to pass upon facts and determine his action by the facts found. 34 C. J. 1180. The rule has been so recognized and applied in the Texas courts from early times. Thus, in Commissioner General Land Office v. Smith, 5 Tex. 471, Justice Wheeler said: "The distinction between ministerial, and judicial and other official

acts, seems to be, that where the law prescribes and defines the duty to be performed, with such precision and certainty as to leave nothing to the exercise of discretion, or judgment, the act is ministerial; but where the act to be done involves the exercise of discretion or judgment in determining whether the duty exists, it is not to be deemed merely ministerial."

We think the act in question clearly required the land commissioner to make an examination of the field notes and to determine whether there was a conflict. It required him to find that the person making application to lift the certificate was the rightful claimant of it and also to determine whether the certificate was valid or genuine. Clearly these acts required the exercise of discretion. We think it a necessary implication of this statute that if the commissioner had not been satisfied upon the showing made on any of these matters he might have required additional proof before issuing the certificate; or if he had not been satisfied that there was a conflict or that the certificate was valid or genuine, or that the party making application to float it was the rightful claimant of it, it would have been his duty to refuse to issue the copy for relocation. Otherwise, why require these facts to be shown to him? Who, if not the commissioner, is to determine the facts upon which his duty arises to issue the certified copy? The record before us reveals that in the floating of the Eva Lancaster certificate from the Jasper county location, both the land commissioner and the Beaumont Lumber Company, the then owner of it, made strict compliance with every provision of the statute.

Although it is not material whether the land commissioner actually heard proof on the question of conflict in floating the Lancaster certificate, so long as facts giving him jurisdiction to act appear, the nature of his act as being quasi judicial or merely ministerial depending upon the statute which empowered him to act, we will remark in passing that the record shows affirmatively that his decision was based in part at least on sketch and information submitted by the surveyor, Scarborough, in his official capacity.

The principle announced by Mr. Freeman, and quoted above, to the effect that orders and judgments of quasi judicial tribunals are not subject to collateral attack, has been clearly recognized and applied by our courts from the earliest times when dealing with acts of the land commissioner performed by him under legislative authority, which empowered him specifically or by implication to make some finding of fact or exercise a discretion in the performance of the act complained of. Commissioner of the General Land Office v. Smith, 5 Tex. 471; Hancock v. McKinney, 7 Tex. 444; Jenkins v. Chambers, 9 Tex. 167; Styles v. Gray, 10 Tex. 503;

Johnson v. Smith, 21 Tex. 730; Burkett & Murphy v. Scarborough, 59 Tex. 495; Smith v. Walton, 82 Tex. 549, 18 S. W. 217; Wilson v. Dillingham, 14 Tex. Civ. App. 628, 38 S. W. 650. Thus in Johnson v. Smith, supra, it was held by the Supreme Court that the act of the land commissioner in determining the merit and qualifications of an applicant for a patent and the issuance of the patent to him would not be revised by the court; the decision of the land commissioner being final on the facts and the issuance of the grant thereon precluding all inquiry on the subject. In Styles v. Gray, supra, an attempt was made to impeach the grant on the ground that the grantee was never a married woman, a widow, or head of a family, and the Supreme Court upheld the action of the trial court in excluding evidence on that issue; Judge Lipscomb, in the course of the opinion, saying: "But admitting it to be true, that the patentee did not possess the legal qualifications, if there has been no fraud on her part, the different Boards of Land Commissioners and the Commissioner of the General Land Office having passed upon her evidences of qualification, those evidences cannot now be called in question." In Wilson v. Dillingham, supra, the Austin Court of Civil Appeals, in an opinion by Judge Key, held conclusive on collateral attack the action of the Commissioner of the General Land Office in designating and fixing the boundaries of certain railroad reservations under Special Laws 1873, c. 108, section 7, page 324, which act created and continued certain railroad reservations and made it the duty of the Commissioner of the General Land Office to designate such reservations on the maps of his office. In Burkett & Murphy v. Scarborough, supra, the Supreme Court, in an opinion by Associate Justice West, after citing and discussing numerous prior cases in support of the holding, held that the action of a legally constituted board of land commissioners in 1838, deciding who were the heirs of the deceased party, who had been entitled under the law to land, and issuing to them a headright certificate, is conclusive of their right to it, on a collateral inquiry, whether the decision of the board was right or not. In Logan v. Curry, 95 Tex. 664, 69 S. W. 129, 130, it was held that a certificate of occupancy issued by the land commissioner to a purchaser of school lands as a prerequisite to his right to purchase was conclusive and not subject to collateral attack on the ground that the statute requiring three years residence had not been complied with. In that case the certificate of the land commissioner which it was sought to impeach collaterally had been issued under artcle 4218j of the Revised Statutes, which required sales of school land to be made by the Commissioner of the General Land Office or under his direction, and required him to prescribe regulations whereby the purchasers should be re-

quired to reside upon the land as a home for three consecutive years next succeeding their purchase and to make proof of such residence and occupancy to the Commissioner of the General Land Office within two years by his affidavit corroborated by the affidavits of three disinterested and credible persons, to be certified by some officer authorized to administer oaths, and that on making such proof the commissioner "shall issue to the purchaser, his heirs and assigns, a certificate of that fact," etc. In holding that the certificate was conclusive on collateral attack, Judge Gaines, speaking for the Supreme Court, in the course of the opinion, said: "Did the legislature intend to make a law which would leave the titles of the purchasers of its school lands in such uncertain condition? Or was it the purpose to fix a time at which and provide a method by which the question of actual settlement could be set at rest? It is true the language of article 4218j, as hereinabove quoted, reads very much as if it was intended to make it the duty of the commissioner to issue the certificate upon the filing of the affidavits therein required. But such is not the necessary construction. He is doubtless authorized to act upon the affidavits and to issue the certificate, but the affidavit of 'three disinterested and credible persons' is required; and we are of the opinion he is authorized to pass upon the question of the interest and credibility of the witnesses. It is not clear what is meant by the words, 'to be certified by some officer authorized to administer oaths.' Does it mean that the officer is to certify merely to the fact that the affidavits have been made before him, or that the corroborating affiants are 'disinterested and credible persons?' Probably, the latter is the correct construction. But, if so, there are no words in the statute which, either expressly or by necessary implication, make the certificate conclusive of the fact. While, as we have said, the commissioner may act, and in the great majority of cases should act, upon the statutory proof and certificates, we see no good reason why, if facts were brought to his knowledge which should throw a doubt upon the disinterestedness or credibility of the witnesses, he should not inquire into the matter, and refuse his certificate, if satisfied that the land had not been resided upon for the period required by the law. If the certificate be refused, then the title of the purchaser would be open to attack by any one who should settle upon and make application to purchase the land; but, if issued, it would be conclusive, except, possibly, against the state. This construction is consistent with the language of the statute, and since, in our opinion, the contrary construction would be fraught with strife and would conduce to endless litigation, we think it ought to prevail. When the meaning of a written law is involved in a reasonable doubt, that construction should be

given which best comports with a sound public policy."

The rights of claimants of land certificates to float them and the duty of the land commissioner with reference thereto has been the subject of legislation since early times. A number of these enactments and of constitutional provisions bearing upon the question are discussed in the opinion of Judge Short, Section B of the Commission of Appeals, in Stark v. Chaison, 50 S.W.(2d) 776; but we have found no case passing directly upon the question which we are here considering, which arose directly under article 3888 of the Statutes of 1879, as amended by act of 1879 and set out above. We believe, however, that in principle the authorities support the conclusion which we have reached that the act of the land commissioner in permitting the floating of the Eva Lancaster certificate is not subject to collateral attack.

It is appellants' contention that if the original location of the Eva Lancaster certificate in Jasper county was in fact upon unappropriated public domain, as appellees necessarily contend that it was, then the certificate became merged with the land and the effort thereafter to float it was without authority of law and therefore void. This, in effect, was the holding of this court as announced in the original opinion. In support of this contention appellants cite us to the following cases: Adams v. Railway Co., 70 Tex. 252, 7 S. W. 729, 740; New York & Texas Land Co. v. Thomson, 83 Tex. 169, 17 S. W. 920; Chaison v. Stark (Tex. Civ. App.) 29 S.W.(2d) 500.

As we construe the cases cited, none of them, with the exception of the Chaison Case, conflicts with our holding here. In Adams v. Railway Company, there had been no attempt to float the certificates. The opinion makes this clear by stating: "The defendant did not lift or float its certificates from the surveys first made, or withdraw them from the general land-office, because he thought it had certain rights or equities growing out of first files and surveys, which he did not choose to abandon or relinquish." What happened in that case was that the first surveys had been erroneously located although partly, at least, on vacant public land, and an attempt was made to appropriate other and different lands by simply filing so-called corrected field notes describing the latter. This was held to be illegal. In New York & Texas Land Company v. Thomson the question of the effect of an act of the land commissioner in permitting the floating of a land certificate on a showing of conflict was in no way involved. There the first location was on unappropriated public domain but the commissioner had permitted the certificates to be lifted and relocated on the ground that the surveys were illegally made, in that they were square and faced upon a navigable stream in violation of a statute which forbade it. Judge Garrett, speak-

ing for the Commission of Appeals, held that the statute did not authorize the floating of a land certificate on such ground. We do not think the case of Chaison v. Stark is controlling on this question. A writ of error was granted against the judgment of this court in that case and the case was reversed on recommendation of Section B, Commission of Appeals. 50 S.W.(2d) 776. Judge Short, in his opinion, bases the reversal on other grounds, but with the specific reservation that the question of the validity of the floating of the Brownrigg certificate, involved in that case, was not being passed upon. With the exception of the holding in the Chaison Case, we have been cited to no authority, and have found none, which, in our opinion, conflicts with our holding in this case.

It seems clear to us that when the Commissioner of the General Land Office found the existence of a conflict and permitted the floating of the Eva Lancaster certificate upon application properly made by the rightful claimant of it, all in accord with the statute which committed that matter to his jurisdiction, his act in so doing is conclusive in this proceeding. We think it may be open to question that even the state, in a direct proceeding, could now, after a lapse of more than forty years, question the validity of it on the ground that the conflict which he found to exist did not, in fact, exist. Certainly a land title based upon the act of the land commissioner, acting within the province of the law which empowered him to act, regular on its face and relied upon in good faith, and held by those whose rights depend upon the validity of his decision, should not be set aside upon the finding of a court or jury made forty years afterwards that he was mistaken upon the facts upon which he based his action. As said by Justice West of the Supreme Court, in Burkett & Murphy v. Scarborough, supra: "Many previous decisions of this court have been to the effect that after the very great lapse of time that has transpired since these early transactions took place, the action of these special tribunals is no longer open to inquiry in ordinary suits between individuals in which such questions may arise collaterally. The security of property and the repose of society demand the consistent maintenance of this principle. If it were departed from, no man could rely upon any ancient title. Age and acquiescence, instead of giving strength and confidence to a title, would weaken it. The law, in its principles and practice, is eminently conservative. Rights that rest upon the past adjudications of early tribunals and officials must be upheld and respected." The reasoning of Judge West applies with all its force to the facts of this case and requires no elaboration.

In the original opinion in this case Justice LAWHON expressed the view that the issue of a vacancy was not raised by the evidence.

The writer concurs in this view of his predecessor. The majority, however, adhere to the former holding that the evidence was sufficient to carry the issue to the jury. It follows, therefore, that appellee's motion for rehearing should be granted, the former judgment of this court reversing the trial court set aside, and judgment here entered affirming the judgment of the trial court, and it is so ordered.

Rehearing granted, and case affirmed.

WALKER, C. J., dissents.

## On Second Rehearing.

COMBS, Justice.

The majority of the court is of the opinion that appellants' request for additional conclusions of fact on the issue of vacancy should be refused. It is their judgment that the evidence was sufficient, as a matter of law, to raise the issue of vacancy, and sufficient in probative force to sustain the finding of vacancy. The fact conclusions requested by appellants, as the majority of the court construes them, are for the most part deductions from the evidence as a whole and are to the effect that no vacancy existed. Much testimony was introduced in the lower court on this issue; the testimony offered by appellants was to the effect that no vacancy existed while, as the majority of the court construes appellees' testimony, it was to the effect that a vacancy did exist. To set out isolated facts or specific portions of the testimony introduced by appellants, without quoting from the record the evidence relied upon by appellees to controvert appellants' testimony, would, in the judgment of the majority, only confuse the issue. Manifestly, the testimony of neither side can be given to any great extent. As the entire record will be available to appellants in support of their assignment to the Supreme Court that the issue of vacancy was not raised, the majority of the court is satisfied to rest their conclusions upon the facts as stated in the opinion of Mr. Justice O'Quinn on the former appeal, reported in Kirby Lumber Co. v. Adams (Tex. Civ. App.) 291 S. W. 279, and of Mr. Justice LAWHON, now on file herein.

As stated in the previous opinion on rehearing, I do not agree with the conclusion of my brethren that the issue of vacancy was raised by the evidence. However, as stated above, in setting forth the views of the majority, the Supreme Court will have before them the whole statement of facts when considering the petition for writ of error, and it would serve no good purpose for me to here attempt to set out in detail the evidentiary matters bearing upon the question. I deem it appropriate to state that I do not differ with the majority as to the facts shown by the record, but only as to the legal effect of the undisputed facts.

As I view it, the facts, as set forth in the opinions of Judge O'Quinn and Judge LAWHON, taken alone, have the effect, as a matter of law, of fixing the west boundary line of the Geo. Uhler survey as contended for by appellants. They show that stumps of bearing trees called for in the Uhler field notes were found at two of the corners as contended for by appellants, and that along the lines leading to these corners marks on the timber were definitely determined as having been made in 1839, the year in which the Uhler was surveyed. The same surveyer, Mott, who surveyed the Uhler, also surveyed the other "Toby Scrip" surveys, and no other reasonable conclusion can be drawn from the evidence on this point than that these old marks were put there by Mott. I think, as a matter of law, these old marks, and the stumps of the bearing trees called for in the field notes, under the undisputed evidence, have the dignity of natural objects establishing the footsteps of the original surveyor. If this be correct, it is decisive of this lawsuit. For while appellees offered testimony of old marks along the lines contended for by them as the correct location of the Uhler survey, no witness testified as to the age of such marks and the testimony of their witness Roi Blake is to the effect that no marks were found along the lines contended for by appellees which can be identified as having been made by the original surveyor. Appellees, under the undisputed evidence, as I view it, would locate the Geo. Uhler survey by course and distance 13,225 varas east of the Neches river. As I understand it, there is no principle of boundary law more firmly established by the decisions of our courts than that natural objects control over calls for course and distance. Blaffer v. State, supra; 7 Tex. Jur. p. 166 et seq., and cases cited.