### HUMBLE OIL & REFINING CO. et al. v. STATE et al.

#### No. 8249.

Court of Civil Appeals of Texas. Austin.

Sept. 30, 1936.

Rehearing Denied April 14, 1937.

Jno. C. Jackson, Ira P. Jones, Jr., Lawler, Wood, & Childress, Vinson, Elkins, Sweeton, & Weems, and Jeff D. Farish, all of Houston, T. H. McGregor, of Austin, and Lee M. Sharrar, Robert F. Higgins, and R. E. Seagler, all of Houston, for appellants Texas Co., Frost Bros. Oil Co., Smith & Gates, Inc., Standard Oil Co. of Kansas, John D. Reid, Philip Reid, John Jarmin, Sarah Jarmin, Carrol Reid, Gerald Reid, Elizabeth Reid, Howard Harry, Margaret Harry, Robert Roberts, Rachael Roberts, C. M. Frost, J. M. Frost, Jr., V. W. Frost, V. W. Frost, trustee, J. F. W. Kobs, Arthur Kobs, Emma Kobs, A. N. Cannon, C. F. Hoffman, S. P. Farish, trustee, and Humble Oil & Refining Co.

Wm. McCraw, Atty. Gen., and H. Grady Chandler and Russell Rentfro, Asst. Attys. Gen., for the State.

Greenwood, Moody, & Robertson, of Austin, for appellees Cone, Jones, and Biggio.

Williams & Williams, of Austin, for appellees Holderreith and Doughtie.

BLAIR, Justice.

The State of Texas sued in trespass to try title to recover 103 acres of land in Harris county, alleged to be a vacancy existing between the north line of the International & Great Northern survey and the south line of the lower Hooper

and Goodrich surveys. The corrected field notes of the International & Great Northern survey called for the south line of said Hooper and Goodrich surveys, but the State contended and the trial court held that it could not be extended to adjoin said surveys, because the calls for distance of the east and west lines of the International & Great Northern survey fell short of said south line 305.8 varas, and the calls for distance definitely satisfied all acts constituting the survey when considered in the light of the acts done by the surveyor and the parties to the grant in identifying and describing the land intended to be included in the International & Great Northern survey. Judg-ment was in favor of the State for the 103-acre vacancy, subject to certain patent or preferential purchase, or preferential mineral rights of some of the defendants to parts of the land. The primary question for determination is whether the 103-acre tract lies within or outside the bounds of the International & Great Northern survey; and the secondary questions relate to the patent or preferential purchase, or preferential mineral rights adjudicated.

The attached map shows the location of the 103-acre vacancy as found by the trial court, and shows the location of Willow creek and the adjacent and surrounding surveys as now accepted and established on the ground:

The Joseph House was the senior survey, its field notes having been made in 1831, and its south line was the base for all surveys south. The four Hooper and Goodrich surveys, constituting a block or system of surveys, were made at the same time by surveyor Trott, in 1838. The upper Goodrich and Hooper called for the Joseph House south line as their northern boundaries; and the lower Hooper and Goodrich were tied to the upper surveys, and the southeast and southwest corners of said lower surveys were, according to their field notes, marked by "a stake and mound in prairie." Each of these surveys was in the form of a square with lines 1900.8 varas in length, and contained 640 acres, and the distance from the south line of the Joseph House survey to the southeast corner of the lower Hooper survey and the southwest corner of the lower Goodrich survey is accepted as 3801.6 varas. Subsequent to surveying the Goodrich and Hooper surveys, Trott surveyed the A. Senechal survey, and fixed its southwest corner 1900.8 varas south of the south line of the lower Goodrich survey. This southwest corner of the Senechal survey as now recognized is the same as the one originally platted by Trott, and is the same as the northeast corner of the George Lamb survey, and the International & Great Northern survey was built up from the north line of the said George Lamb survey, with its beginning point at the northwest corner of said survey. The certificate issued to the International & Great Northern Railroad Company called for 640 acres and was located in Harris county, and surveyed by County Surveyor J. J. Gillespie, in March, 1877, and the certificate and field notes returned to the Land Office and filed April 7, 1877. The International & Great Northern survey was made upon an abandoned survey of 640 acres in the name of E. S. Perkins, assignee of John H. Bowers, made in 1840 by surveyor Henderson, and later forfeited by the Land Commissioner. This abandoned Perkins survey was in the form of a square, with the length of its entire 1,901 varas, and had its east line and its northeast and southeast corners coincident with the west line and the northwest and southwest corners of the A. Senechal survey. The original field notes of the International & Great Northern survey read as follows:

"Said Survey is situated on the waters of Willow Creek about 25 miles N.W. from the City of Houston;

"Beginning at the N.W. corner of a survey of 320 acres in the name of George Lamb;

"Thence North 1900 varas to a corner in the prairie on the South line of a survey of 640 acres in the name of J. M. Hooper;

"Thence East 1900 varas along the Hooper and Goodrich south lines to the N.W. corner of the Senechal Survey;

"Thence South 1900 varas along the West line of Senechal Survey to Lamb's N.E. corner;

"Thence West 1900 varas along Geo. Lamb's North line to the place of beginning."

These field notes were rejected and on January 11, 1878, Gillespie filed corrected field notes of the International & Great Northern survey, which read as follows:

"Beginning at the N.W. corner of a survey of 320 acres in the name of George Lamb;

"Thence North 1595 varas to a corner in the prairie on the South line of a survey in the name of J. M. Hooper;

"Thence East 1900 varas along the Hooper and Goodrich south lines to the W. line of the Senechal Survey;

"Thence South 1595 varas along the West line of the Senechal Survey to Lamb's N.E. corner;

"Thence West 1900 varas along George Lamb's North line to the place of beginning."

It will be noted that there was no change in the beginning point of the corrected field notes, but the east and west lines were shortened from 1900.8 varas to 1,595 varas, and the call for the south line of the Hooper survey, as well as the call to run east with said south line and the south line of the lower Goodrich survey were retained. However, the northeast corner under the corrected field notes was fixed at a point in the west line of the A. Senechal survey 1,595 varas north of its southwest corner, instead of in its northwest corner as called for in the original International & Great Northern field notes. The corrected field notes were approved by the Land Office February 5, 1878, and a patent was issued, delivered

and accepted in accordance therewith, calling for a rectangular tract of land 1,595 by 1900.8 varas, and for 536 and 4780/5645 acres of land; and the original certificate was endorsed satisfied to that extent. An unlocated balance certificate for the residue of 103 and 865/5645 acres of land was issued to the International & Great Northern Railroad Company on November 21, 1878, and same was located in Webb county and patent issued in 1880, thus fully satisfying the original certificate for 640 acres of land; and neither the International & Great Northern Railroad Company nor any one claiming or holding under it ever protested in any manner against the correction of the field notes, but accepted patents to the 536 and a fraction acres in Harris county, under the original certificate for 640 acres, and to the 103 and a fraction acres in Webb county, under the unlocated balance certificate.

In addition to the above undisputed facts, the trial court found as follows:

"The north line of the George Lamb Survey is not in controversy, but is well located on the ground and is now recognized as being in its true and original position. The south lines of the Lower Hooper and Goodrich Surveys were open, unmarked prairie lines, and both the southwest and southeast corners of the Hooper Survey, as well as both the southwest and southeast corners of the Goodrich Survey, were never marked except by stakes and mounds in the prairie, which cannot now be found and identified, all of which were indefinite and uncertain, both on the ground and in the General Land Office, when the survey and corrected field notes of the I. & G. N. Survey were made in 1877 and 1878. * * * At the time Gillespie surveyed the I. & G. N. Survey and filed corrected field notes thereon in January, 1878, he began at the northwest corner of the George Lamb Survey, but did not locate on the ground or reach the south line of the Hooper or Goodrich Surveys. * * *

"The Court further finds that by fixing the northwest corner of the I. & G. N. R. R. Company Survey at a point 1595 varas north of the northwest corner of the George Lamb Survey, and with its northeast corner in the west line of the Auguste Senechal Survey 305.8 varas south of the northwest corner of said Senechal Survey, according to the corrected field notes, there

will be the full amount of acreage called for, or 536-4780/5645 acres, and the calls for course, distance, and configuration contained in the corrected field notes will be fully respected."

From the foregoing facts, the trial court concluded that the call for the "unmarked prairie lines" of the lower Hooper and Goodrich surveys as same existed in 1877–78, should not control or be given effect over the call for course and distance as contained in the corrected field notes of the International & Great Northern survey; and that even if the south lines of the said Hooper and Goodrich had, in 1877–78, been marked by the "stake and mound" called for by the original surveyor thereof, still the call for such marked south lines should not be given controlling effect, because the undisputed evidence showed that surveyor Gillespie who made the International & Great Northern survey in 1877 and who later in 1878 corrected the field notes, did not know where such south lines of the Hooper and Goodrich were located, and his call for said lines in the corrected field notes was based upon conjecture and upon a mistake and must yield to the call for distance and reduced acreage, and the intention of the parties to the grant.

Appellants contend that the call for the south lines of Hooper and Goodrich surveys must control the call for course and distance of the corrected field notes of the International & Great Northern survey, because there is no uncertainty as to the location of these lines on the ground, and because of the rule that the call for adjoinder to senior surveys will prevail over the call for course and distance, and will extend the north line of the International & Great Northern survey to coincide with the south lines of the senior surveys without regard to the fact that the actual distance between the north line of the Lamb survey and the south lines of the Hooper and Goodrich surveys is in excess of the distance called for in the corrected field notes. In this connection, appellants complain that the finding of the court that said south lines of the Hooper and Goodrich were unmarked and uncertain at the time Gillespie made the International & Great Northern survey in 1877–78, is contrary to the undisputed evidence; and that the finding that the northeast corner of the International & Great Northern survey was fixed in the west line of the Senechal

survey at a point 1,595 varas from its southwest corner instead of its northwest corner is also contrary to the undisputed evidence. Appellants further contend in this connection that the findings that the patent to the International & Great Northern survey was issued, delivered, and accepted on the corrected field notes calling for a rectangular tract containing 536 and a fraction acres, and that a certificate for an unlocated balance of 103 and a fraction acres was issued, accepted and location later made thereunder in Webb county, are immaterial and cannot serve to break the call for the adjoinder with the south lines of the Hooper and Goodrich surveys. We do not sustain these contentions.

■ It is true that there is now no uncertainty as to the location of the south lines of the Hooper and Goodrich surveys, but the evidence fully supports the finding of the court that the south lines of these surveys were open unmarked prairie lines, and that the southwest and southeast corners of both of said surveys were never marked, except by stake and mounds in the prairie, which cannot now be found and identified; and that all were indefinite and uncertain, both on the ground and in the records of the Land Office when the survey and corrected field notes of the International & Great Northern survey were made by Gillespie in 1877–78. But even if the location of the south lines and the southwest and southeast corners of the Hooper and Goodrich were marked on the ground, or could have been located under some applicable rule at the time the International & Great Northern survey was made, still the adjoinder rule of boundary has no application to the instant case, because the adjoinder rule has no application where the facts conclusively show that the surveyor through mistake or conjecture called for the adjoinder, and in such cases the call for adjoinder does not control the call for course and distance, even though the line or corner called for was marked. The rule or rules applicable are stated in the recent case of State v. Sullivan (Tex.Com.App.) 92 S.W. (2d) 228, 233, as follows: "* * * where the facts conclusively show that the surveyor through mistake or by conjecture called for the adjoinder, the call for adjoinder does not control over course and distance, even though the line or corner called for was marked. In such situation

the call for adjoinder will be rejected, as inserted by mistake, and controlling effect given to course and distance from known and undisputed corners, when under the facts of the particular case such construction of the survey is 'most consistent with the intention to be derived from the entire description.' This method of construction by the rejection of a call for adjoinder inserted by mistake is most consistent with the true intention if its effect is to harmonize the other terms of the field notes and to disregard as few of the calls as possible." See, also, Wilson v. Giraud, 111 Tex. 253, 264, 231 S.W. 1074, 1078; Porter v. State (Tex.Civ.App.) 15 S.W.(2d) 191, 193; Finberg v. Gilbert, 104 Tex. 539, 547, 141 S.W. 82; Gerald v. Freeman, 68 Tex. 201, 204, 4. S.W. 256; State v. Talkington (Tex.Civ.App.) 274 S. W. 314; Cox v. Finks (Tex.Civ.App.) 41 S.W. 95, 99; Gilbert v. Finberg (Tex.Civ. App.) 156 S.W. 507; Lafferty v. Stevenson (Tex.Civ.App.) 135 S.W. 216, 220; Lomax v. Rowe (Tex.Civ.App.) 3 S.W. (2d) 498.

■ The undisputed evidence showed that the north line and northeast and northwest corners of the Lamb survey were well located on the ground and are now where they were when Gillespie began at its northwest corner to build the International & Great Northern survey. The Lamb survey was constructed from the south line and south corners of the abandoned Perkins survey, which was definitely tied to the east line and the southeast and southwest corners of the Senechal survey; and as to the location of the Senechal survey there has never been any dispute or doubt. So, it is apparent that if Gillespie made his survey of the International & Great Northern survey under the corrected field notes, he did not and could not have reached the south lines of the lower Hooper and Goodrich surveys in 1,595 varas, because the undisputed proof showed that distance to be approximately 1,900 varas. This demonstrates that Gillespie did not know where the south lines of said Hooper and Goodrich were when he made his survey of the International & Great Northern survey and returned his corrected field notes in 1878; and manifestly a call for a survey line, whether marked or unmarked, will not control a call for course and distance, where it clearly appears that the surveyor did not know where the line was.

It is also undisputed that the corrected field notes were approved, a patent issued, delivered, and accepted in accordance therewith, calling for a rectangular tract of land 1595 by 1900.8 varas, and containing 536 and a fraction acres; and the original certificate for 640 acres was marked satisfied to that extent, and the unlocated balance was lifted and floated, and location of the 103 and a fraction acres residue was made in Webb county in 1880, when a patent for such residue was issued, delivered and accepted, thus fully satisfying the original certificate for 640 acres. These acts of the surveyor and the parties to the grant clearly identify and describe the land intended to be included in the International & Great Northern survey as being a rectangular tract of land 1,595 by 1900.8 varas, and containing only 536 and a fraction acres. Manifestly, the surveyor and the parties to the grant had a purpose in view when the distances of the east and west lines of the International & Great Northern survey were shortened 305.8 varas, and the acreage reduced from 640 to 536 and a fraction, and that such purpose was to rebuild the International & Great Northern survey so as to not supposedly conflict with the south lines or portion of the Hooper and Goodrich surveys. Manifestly the parties did not intend to cover exactly the same land by the original as by the corrected field notes. If that were true, then there would have been no necessity for the corrected field notes, which shortened the east and west lines and reduced the acreage. Keyser v. Meusback, 77 Tex. 64, 13 S.W. 967. So, when all of the above-mentioned facts and matters are construed or considered together, the course and distance calls of the east and west lines of the corrected field notes of the International & Great Northern survey, which coincide with quantity and configuration of the survey as patented, more clearly and certainly reflect the intention of the parties to the grant than does the call for the south open prairie lines of the Hooper and Goodrich surveys. Under the corrected field notes, there is only one way by which the International & Great Northern survey's west line can now or could ever have been found on the ground, which was to first find the northwest corner of the Lamb survey, the beginning point of Gillespie; and if either of its calls is used as a beginning point, the return must necessarily be made to the northwest corner of the Lamb survey, in order to find the west line of the International & Great Northern survey. It is also manifest from the facts above stated, that if the uncertainty had been as to the location of the north line of the Lamb survey, instead of as to the south line of the Hooper survey, the surveyor would not have made the beginning point at the northwest corner of the Lamb survey. Naturally he would have changed the beginning point from the supposedly uncertain corner to the one regarded as definitely fixed or marked on the ground. Our above interpretation of the acts of the surveyor and the parties to the grant is more consistent with their intention as derived from the entire description contained in the corrected field notes; and the rejection of the call for adjoinder to the south line of the Hooper as being inserted by mistake or conjecture will have the effect of harmonizing other terms of the corrected field notes, and will result in disregarding fewer calls than would be the case if appellants' contention were sustained.

But appellants contend by supplemental briefs that a change in the Land Office map of 1861 brought about the uncertainty as to the amount of land lying between the Hooper and Goodrich surveys and the George Lamb survey, and that the uncertainty was in the location of the south line of the C. N. Pillot survey, and that if any vacancy existed, it was south of the International & Great Northern survey and just north of the George Lamb survey. The Land Office map of 1847 shows the location of the south line of the Pillot survey and the south lines of the lower Hooper and Goodrich surveys to be at the same point as they are now shown on the above map, and to coincide, and the north line of the Lamb survey was also at the same point as shown on the above map. There appeared on the Land Office map of 1861, for the first time, uncertainty as to the existence of a conflict between the abandoned Perkins survey and the lower Hooper and Goodrich surveys, and this same conflict was shown on the Land Office maps of 1876 and 1884, 1893 and 1896. The 1896 map continued to be the official Land Office map until shortly before this suit was filed, when it was corrected to substantially comply with the above map, which is admitted to show approximately the true situation and locations as they now exist on the ground. The following

map shows the conflict and Willow creek, as found on the several erroneous maps: of the Pillot crosses the creek several times and its field notes call for such cross-

The Land Office map of 1847 shows that Willow creek crosses the south line of the Pillot survey four times; the 1861 map twice, and the same in the 1876 map; all of which show the south line of the Pillot survey as being located at approximately the medium point or line of the meanders of Willow creek and the calls in the Pillot survey field notes are for such crossings and definitely fix the location of that line on the ground. The north line of the Senechal and the south line of the Pillot coincide. The northwest corner of Senechal is in the south line of the lower Goodrich, and when placed in this situation the south lines of the Hooper and Goodrich projected east follow the north line of the Senechal and the south line of the Pillot, and Willow creek is found on the ground south of the southeast corner of the Goodrich, instead of some 400 or 500 varas north of that corner as was shown on the erroneous Land Office maps when both the original and corrected field notes of the International & Great Northern survey were sent to the Land Office in 1877–78. Neither the Hooper nor Goodrich field notes called for Willow creek, but since it is the only natural object on the ground in the vicinity in question, and since the south line

ing, the location of said creek becomes important, because the location of the only natural object on the map should be given greater dignity than artificial lines thereon; and the fact that the south line of the Pillot survey was placed at the same point on all of these maps with reference to the meanders of Willow creek up to and including the time the survey in question was made and the patent issued, strongly indicates that the location of the south line of the Pillot was not changed; nor was it in doubt when the conflict between the lower Goodrich and Hooper surveys and the Senechal and abandoned Perkins surveys was first shown on the Land Office map of 1861. Huff v. Crawford, 89 Tex. 214, 222, 34 S.W. 606. This more clearly indicates that the Land Office draftsman in showing the conflict moved the south lines of the lower Hooper and Goodrich surveys south instead of moving the south line of the Pillot north, because the latter would necessarily require the moving of Willow creek north three or four hundred varas of even where these maps erroneously showed it to be. It is also manifest that the south line of the Pillot survey could not have been moved north without changing some of the relative positions

of the adjacent and surrounding surveys. So, it is evident from the relative positions of the Pillot south line and Willow creek, of Willow creek and the south lines of the lower Hooper and Goodrich, and the relative positions of all the adjacent and surrounding surveys, that the change or mistake resulting in the supposed conflict as shown on said Land Office maps was not caused by moving the Pillot south line north, but by erroneously moving the south lines of the lower Hooper and Goodrich south. Thus it reasonably appears that the only mistake was that of the Land Office draftsman who thought the south lines of the Hooper and Goodrich surveys were some 400 or 500 varas south of Willow creek, when in fact such line was actually north of Willow creek. Clearly the mistake was not in the location of the south line of the Pillot survey, because its south line crossed Willow creek several times and its field notes called for such crossing, and all the maps showed the south line of the Pillot to be the median line of the meanders of Willow creek. There was no evidence that Willow creek ever changed its channel or course from where it is now actually located, as shown on the first above map. It is the only natural object shown on the maps in the vicinity of the land in question. If extended into the abandoned Perkins survey, as shown by some of the maps used in the trial of this case, it would be located at approximately 1,595 varas north of the north line of the Lamb survey. Gillespie's original field notes of the International & Great Northern survey recited that "said survey is situated on the waters of Willow Creek about 25 miles N.W. from the city of Houston." Thus it is evident that if he knew where the creek was, he did not know where the south line of the Hooper and Goodrich surveys was when he made his original field notes; and since his calls for distance in his corrected field notes fell short of the said south line, the trial court's finding that the surveyor did not know where such south line was is fully supported by the evidence. It is very probable that the mistaken position or location of Willow creek on the early Land Office maps caused the Land Office maps to be erroneously changed, and to show that the International & Great Northern survey was not in the form of a square, but was in the form of a rectangle, and to show that the lower Goodrich survey was in

conflict with the northwest corner of the Senechal survey. And since the Senechal survey can be definitely located from the south line of the Pillot, the Perkins from the Senechal, and the Lamb from the southeast corner of the Perkins, the north line of the Lamb is therefore more dependent on the location of the south line of the Pillot than on the location of the south line of the lower Hooper and Goodrich. It, therefore, clearly appears that the vacancy is where the trial court found it to be.

■■ Nor do we sustain the contention of appellants that since 640 acres were actually patented in Harris county, and there was no unlocated balance upon which a certificate for an unlocated balance could properly issue, the State should go to Webb county and recover the land located under the unlocated balance certificate. The International & Great Northern Railroad Company and those claiming under it are estopped to assert this question. They never protested in any manner the action of the surveyor in making the corrected field notes. They accepted and acted upon the original and unlocated balance certificates. The law presumes that the Land Commissioner was authorized to act on the corrected field notes; his decision is not subject to collateral attack, and the records relating to these matters as appearing in the Land Office are notice of all things pertaining to the certificates. Ward v. Forrester (Tex.Civ.App.) 87 S.W. 751; Kirby Lumber Co. v. Adams (Tex.Civ. App.) 62 S.W.(2d) 366; Crook v. Texas Co. (Tex.Civ.App.) 51 S.W.(2d) 651; Fristoe v. Blum, 92 Tex. 76, 45 S.W. 998; Thompson v. Houston & T. C. Ry. Co., 68 Tex. 392, 4 S.W. 629.

Since the State is entitled to recover the 103-acre vacancy, we pass to the secondary questions presented in the appeal.

Wm. Holderreith and S. T. Doughtie purchased 31.6 acres of the 103-acre vacancy from the State and a patent therefor was issued to them. This patent is not attacked by any pleadings, evidence, or assignment of error, except appellants contend that if no vacancy existed as claimed by them, then the patent is void. We have held that the vacancy did exist, and this concludes the question as against appellants.

The judgment recited that there might be some question as between the State and

patentees Holderreith and Doughtie as to the extent of the minerals owned by them in the 31.6 acres, but the judgment dismissed the issue without prejudice to the right of the State to litigate the question later. Neither the pleadings nor the evidence raised any issue as to the minerals in the 31.6 acres. The patent reserved a 1/16 free royalty in the minerals to the State. Holderreith and Doughtie seek to have the recitation in the judgment reviewed as casting cloud upon their title to the minerals. Since neither the pleadings nor the evidence raised the issue, the mere calling attention to the possible issue in the judgment did not determine the issue, but expressly left the issue for determination in some future action where raised by proper pleadings and evidence. In any event the question is not before this court by any pleadings, evidence or final judgment determining the issue as to minerals.

The judgment awarded J. F. W. Kobs a preference right to purchase 10.6 acres of the 103-acre vacancy as an occupant thereof in good faith, under section 5, chapter 271, Acts 42d Leg. p. 452 (Vernon's Ann.Civ.St. art. 5421c, § 5). This portion of the judgment is not attacked in any manner.

As to the remainder of the 103-acre vacancy, the judgment further decreed that appellees, Wm. Biggio, Murray B. Jones, and Gordon M. Cone, had discovered same as unsurveyed school land, and had duly filed their applications to obtain mineral leases on their respective described tracts or areas, in compliance with the provisions of section 8 et seq., chapter 271, Acts 42d Leg. p. 452 (Vernon's Ann.Civ.St. art. 5421c § 8 et seq.); and that said appellees were each entitled to proceed further and obtain his mineral lease from the State in accordance with said statutes. Appellants attack this portion of the judgment upon the ground that either they as lessees of the minerals, or their predecessors in or warrantors of title, had applied for and were entitled to a preference right to purchase such unsurveyed school land as occupants in good faith under the provisions of section 5 of said chapter 271, Acts 42d Leg., p. 452 (Vernon's Ann.Civ.St. art. 5421c, § 5). The trial court found and concluded (1) that neither appellants nor their predecessors in or warrantors of title to the minerals had complied with the statutes with respect to the preference right to

purchase for several reasons; (2) that appellant corporations were prohibited from purchasing the land by statute; and (3) that the unsurveyed school land involved was not subject to sale, because situated within five miles of a producing oil well at the time such applications for preference right of purchase were filed, and at the time of the trial of this case.

We have reached the conclusion that the trial court correctly construed chapter 271, Acts 42nd Leg., p. 452, as withdrawing from sale the surface right of all school land situated within five miles of any well producing oil or gas in commercial quantities. Sections 2, 3, and 4 of the act (Vernon's Ann.Civ.St. art. 5421c, §§ 2–4) authorize the sale of surveyed school land with reservation of a portion of the minerals and with proviso, "that all such land within five miles of a well producing oil or gas in commercial quantities shall be subject to lease only, and the surface rights shall not be sold." Section 5 of said act (Vernon's Ann.Civ.St. art. 5421c, § 5) provides for patenting of certain lands occupied in good faith for a period of ten years; and further provides "that in all cases where a tract of school land has been occupied by mistake as a part of another tract, such occupant shall have a preference right for a period of six months after the discovery of the mistake, or after the passage of this Act, to purchase the land at the same price paid or contracted to be paid for the land actually conveyed to him." Section 6 of the act (Vernon's Ann.Civ.St. art. 5421c, § 6) provides that "any one desiring to buy any of the unsurveyed land included in this Act not situated within five miles of a producing oil or gas well shall file with the county surveyor of the county in which the land may be situated, an application for survey describing the land in such manner as will enable the surveyor to identify it and pay the surveyor a fee of One Dollar ($1.00) for filing and recording said application and also deposit with him such sum of money as will pay for citing the claimant or claimants of the land, if any, and the adjoining owners as the tax rolls may disclose the names of such claimants or adjoining owners." This section further provides, that if the area be "unsurveyed and subject to sale," it may be purchased on the terms prescribed by the act; and provides for a preferential right of purchase in the person having the

unsurveyed area inclosed with other land in good faith, or by the person occupying such area as a home. Section 8 (Vernon's Ann.Civ.St. art. 5421c, § 8), provides for the lease of "both surveyed and unsurveyed" school land, and provides that "any person who discovers an unsurveyed area of school land * * * may apply in writing * * * to purchase a mineral lease thereon" under the terms and conditions provided by sections 8, 9, 10 and 11 of the act (Vernon's Ann.Civ.St. art. 5421c, §§ 8, 9–11). That is, by paying the price fixed or bid, and "in addition to the cash amount bid therefor, of not less than one-eighth (⅛) of the gross production of oil, or the value of same" and ⅛ of the gas and ¹⁄₁₆ of all other minerals.

It is manifest from the language of the entire act that the Legislature intended to provide that all school land, both surveyed and unsurveyed, within five miles of any oil or gas well producing oil or gas in commercial quantities, "shall be subject to lease only," and that the surface rights thereon shall not be sold. Section 2 relating to surveyed school land specifically so provides. Section 6, which gives a preference right of purchase to those having the land enclosed, or the occupant, specifically limits its provisions to land not situated within five miles of a producing oil or gas well. This section further directs that the survey and field notes must be filed in the Land Office within 120 days from the date of the application to purchase, and further provides that "if the area is found by the Commissioner to be unsurveyed and subject to sale," then he shall proceed with the application as directed. Sections 1, 2, and 6 (Vernon's Ann.Civ.St. art. 5421c, §§ 1, 2, 6) provide that all school land shall be subject to sale, except that situated within five miles of a producing oil or gas well.

■ The language, "shall be subject to lease only, and the surface rights shall not be sold," if the land is situated within five miles of a producing oil or gas well, is plain and unambiguous. The same is true of the language, "any one desiring to buy any of the unsurveyed land * * * not situated within five miles of a producing oil or gas well." Such language shows clearly the intention of the Legislature to provide for the "lease only" of all school land situated within five miles of an oil or gas well. The legislative purpose is manifest. It was intended to pro-

hibit the sale of the "surface rights" so as to avoid any question of ownership, possession, use or damages to the surface in the development of such land for oil or gas. It is also common knowledge that land situated within five miles of an oil or gas field is more valuable for mineral development than for surface purpose, so the Legislature, as would any prudent owner, withdrew such land from sale, and provided for its lease for mineral development for a much greater consideration than provided for the sale of land beyond the five-mile limit. That is, in cases where the land was within the five-mile limit the lessee was to pay in addition to the price fixed or bid for the lease ⅛ of the oil or gas, or their value, and ¹⁄₁₆ of the other minerals. On the other hand, where the land was situated beyond the five-mile limit and "subject to sale," the purchaser was to pay the price fixed, and only ¹⁄₁₆ of the minerals was reserved to the State. So we must conclude that the legislative intent to "lease only" land situated within five miles of a producing oil or gas well is plain and unambiguous.

■ But appellants contend that the general language of section 5, which provides "that in all cases where a tract of school land has been occupied by mistake as a part of another tract, such occupant shall have a preference * * * right to purchase," is not limited or controlled by the five-mile lease only provision. Manifestly, this contention is not sound, because there could have been no point in the Legislature providing in section 5 that an occupant had a preference right to purchase lands either within or without the five-mile limit, and at the same time by sections 2 and 6 of the act expressly declare that lands, both surveyed and unsurveyed, were not subject to sale if located within five miles of an oil or gas well. Manifestly the Legislature would not have declared by section 5 that "all school land" was subject to the preference right of the occupant to purchase, and at the same time declared by section 6 that only unsurveyed school land not situated within five miles of a producing oil or gas well was subject to sale and to the preference right of the occupant to purchase.

But appellants contend that Senate Concurrent Resolution No. 4, adopted by the 42nd Legislature at its First Called Session (Vernon's Ann.Civ.St. art. 5421c note), should be considered in the con-

185

struction of the preference right to purchase provisions of section 5, supra. This resolution reads as follows: "That it was the intention of the Legislature, and is now the intention of the Legislature that public school land occupied by mistake as provided in said Section 5 be sold to the occupant at the same price which such occupant paid or contracted to pay for his adjoining tract and of which he in good faith thought such public school land a part, and it is further declared that it was not and is not intended that said privilege of purchasing such land shall be abridged, limited, subject to or burdened with any other provision of said Act or pre-existing law, except as to the reservations of said Section 4."

Clearly this resolution attempts to amend a statute by a resolution. Chapter 271 clearly expressed the intention of the Legislature to provide for the lease only of school lands situated within five miles of a producing oil or gas well. The resolution seeks to declare that section 5 was not intended to be so abridged, limited, subject to, or burdened with any such provision of the act. A statute cannot be amended by a resolution. It must be amended by re-enactment and publication at length, and by an act or bill which is subject to the veto power of the Governor. Article 3, sections 29, 30, 35 and 36 of Constitution of Texas.

Since we have held that the land in controversy was subject to lease only, all other questions as to the preference right of appellants or their warrantors or predecessors in title became immaterial. Nor do appellants have any right to attack the leases of appellees. Such is a matter for the State, and it has in no manner attacked such leases or the applications therefor.

The judgment of the trial court will be affirmed.

Affirmed.

On Motion for Rehearing.

This case has been held on rehearing pending a decision of the Supreme Court in the case of Caples v. Coles, 102 S.W. (2d) 173, rehearing denied April 14, 1937. This decision sustained the view of this court on the issue that lands situated within five miles of a producing oil well were withdrawn from sale and were subject to lease only.

The motion for rehearing will be overruled.

Overruled.